## HUTCHINSON *vs.* THE MARKET BANK OF TROY.

Where a judge was requested to charge the jury that entries made by witnesses, in the books of a bank of what they swore they did, at the time, were evidence of the facts, and entitled to the same credit as their evidence, although the witnesses making the entries did not recollect them; and that such entries were more reliable than the recollection of the plaintiff, after a lapse of nearly six years; *Held* that such request was properly refused; and that it was correctly left for the jury to say, upon all the evidence, which was entitled to the greater weight.

The plaintiff claimed to have left a draft with a bank for collection, on the 24th of July, 1856.  His bank book was written up as early as August or September, 1856, and balances were struck and the vouchers delivered up to him repeatedly, afterwards, until 1859, when he drew out of the bank the balance remaining to his credit.  In September, 1856, he knew, or with reasonable attention might have known, that the draft was not credited to him on the books of the bank; yet he omitted to bring the matter to the notice of the bank until the spring of 1862.  *Held* that this was a *stated account,* not objected to within a reasonable time; so clearly so, that it was not, under the evidence, a question proper for the consideration of the jury, whether the delay was sufficiently accounted for.

*Held, also,* that the judge properly refused to charge that under the circumstances the plaintiff was *absolutely* and *conclusively* bound by the stated account, and could not recover of the bank the amount of the draft. The true rule in such cases is that the stated account is conclusive upon the parties, unless the plaintiff is able to impeach it by showing affirmatively fraud or mistake.

A stated account never gives to a party claiming under it the benefit of an absolute *estoppel.* In practical effect it gives to him little more than these two advantages: 1. When the question arises upon the pleadings, the court has, in some instances, in granting permission to amend or reply, some equitable coatrol over the power of opening accounts; 2. When the question arises upon the trial, the party impeaching the account has the affirmative of the issue, and the burthen of proof. *Per* HOGEBOOM, J.

Where, in an action to recover a sum claimed by the plaintiff to be due to him, on the ground of an omitted credit, the defendant simply interposes the defenses of a general denial, and payment, and under the issues thus framed, the parties have investigated the whole case, on the trial, without objection, the defendant cannot afterwards be allowed to say it is not a case, *upon the pleadings,* for examining the question of fraud or mistake.

APPEAL from a judgment ordered at the circuit, and from an order refusing to grant a new trial.

The action was commenced in July, 1862. The complaint alleges that the plaintiff was the owner of a draft, dated July 7th, 1856, for $884, drawn by Samuel S. Whallon, canal commissioner, on the auditor of the canal department; that on or about the 24th of July, 1856, the plaintiff left this draft with the defendant for collection; that the defendant collected the draft and has never paid the same to the plaintiff. The answer, 1st. Denies the complaint; 2d. Sets up payment of the draft.

The action was tried at the Rensselaer circuit, November 22, 1865, by Justice MILLER and a jury, and a verdict rendered in favor of the plaintiff, for the amount of the draft and interest, upon which judgment was entered for $1702.75 damages and costs. A motion was made at the circuit to set aside the verdict and for a new trial, which was denied. From that order, and the judgment, the defendant appealed.

The plaintiff is, or formerly was, a blacksmith, residing at Troy, and the defendant a banking corporation located at the same place. In 1856 the plaintiff was building bridges for

the state, on the Erie and Oswego canals ; was paid by canal commissioners' drafts on the auditor of the canal department. The draft set out in the complaint, dated Mayville, July 7, 1856, was one of these drafts. The plaintiff received another draft from Henry Fitzhugh, canal commissioner, dated July 1, 1856, for $853.47. They are so connected that the facts touching both require examination.

The plaintiff claims and swears that these two drafts were left with the defendant for collection, one on the 23d, the other on the 24th of July, 1856, and that he never has been paid the draft in suit. The defendant claims that neither of the drafts was left for collection, but that the draft in suit was received by it as cash and the money paid to the plaintiff on it some days previous to the 23d and 24th of July ; the other deposited by him as cash on the 24th of July, and he credited by the defendant with the amount on that day.

The plaintiff's case rested mainly upon his own testimony, fortified to some extent by that of Lynd, who had some interest in the draft. In 1856 the plaintiff had an account with the defendant, which was finally closed August 24th, 1859. At that time he kept no other bank account, was in the habit of negotiating these drafts with the defendant, and did not negotiate them elsewhere in Troy. The defendant's corresponding bank in Albany was the Bank of the Capitol. It had no other agent in Albany. The defendant sent to Albany, by express messenger, usually a couple of days before advised of the payment of drafts. The draft for $853.47 was received by the defendant July 24, 1856. The plaintiff swears it was left for collection. This is denied, and made to some extent improbable by its being charged and credited on the exchange books of the two banks, and not on their ticklers, where it would have been placed if received for collection. The amount is also credited by the defendant to the plaintiff on the same day. For a statement of books kept by the defendant, the defendant introduced the evidence of Watson, its teller in 1856. They were kept in the ordinary

way. In its dealings with the Bank of the Capitol amounts only were entered, without specifying for what; and the Bank of the Capitol kept its account with the defendant in the same way. In such dealings collections were entered upon the tickler, cash items upon the exchange book.

On July 15, 1856, the Bank of the Capitol was charged by the defendant, on its exchange book, with an item, among others, of $884. July 16th the Bank of the Capitol received this remittance from the defendant, and on July 18th sent the defendant a remittance of twelve items, one of which was $884. This remittance was received and credited by the defendant on the same day, and on July 24th, in a remittance by the defendant to the Bank of the Capitol of $1789.85, made up of three items, the amount of $884 again occurs; another of the items being $853.47, (the other draft,) and another item, $52.38. This remittance was received and credited by the Bank of the Capitol on July 25th. Both Banks treated the item $884 as cash, by entering it on their exchange books. It was sent and returned as a cash item. Neither of the drafts appear on the defendant's tickler, where they should have been entered if received for collection. The $853.47, it is admitted, was credited the plaintiff on the day named by the defendant, as cash. The plaintiff swears that this draft was not delivered to the defendant before July 23d. The plaintiff admits that *this* draft was first received; and further, he says: "It was spoken of at the time I left it, that it would not probably be paid, in consequence of the receipt not being signed by Mr. Lynd." There is a memorandum on the draft of $884 as follows: "Mr. Hutchinson's assignee must sign the receipt, and indorse the draft, before it can be paid. Edw. James, acting auditor."

Watson, the defendant's teller, testified: "Have seen the original draft; saw that my indorsement had been erased and indorsed again after the name of Lynd. Mr. Gilbert was cashier of the Bank of the Capitol; the draft had been in-

dorsed by him and his indorsement erased and repeated."
Mr. Lynd swears : " Recollect I saw these two drafts there at
the time ; recollect better now than on former examination ;.
when I brought him the $853.47 draft he said that he had
not yet received the money on the $884 draft, and the Bank
wanted the draft and me to give my name upon it ; went to
the Bank and gave my name on it."

Mr. Lynd testified that the plaintiff told him he had
not yet received the money. This witness says : " The $884
draft had not, so far as I know, been to Albany when I was
asked to sign it; don't know that it had not." He says
that it could not be he received the draft as early as 15th
July. The witness testifies : " Am not sure I saw him (the
plaintiff) do any thing with the $884 draft. He wanted me
to go to the bank and indorse it."

The plaintiff had a bank book ; received it some time in
September, 1856 ; delivered him with checks and vouchers ;
his account was written up from time to time, and book de-
livered with vouchers ; he closed his account August 24th,
1859, and drew balance ; he examined his bank book when
he got it, in August or September, and noticed he was not
credited with the $884 draft. He testified : " I at that time
remembered the history of the $884 draft." The plaintiff
made no claim until the spring of 1862, and then, as the de-
fendant claims, he made none. Tappan swears : " He stated
that he had got into a fog in his matters with Lynd, and
wanted to know who got the money on those drafts." The
plaintiff himself testified : " Lynd and I got into a dispute
about who should draw the money on those drafts, &ast; &ast; &ast;
my impression is that nearly four years elapsed before I satis-
fied myself about the draft. I went to the canal department,
and found when these drafts went through. I immediately
communicated with the bank about it ; spoke to Mr. Tappan."
· He admits, afterwards, in his cross-examination, that his in-
terview with Mr. Tappan might have been in the spring of
1862, and Tappan swears it was. He knew the defendant

had the draft, and noticed he was not credited with it on the bank book in August or September, 1856, and then, and until the spring of 1862, acted in accordance with the truth that he had been paid the money on the draft. He kept his account with the defendant for over three years after this, and finally closed it on August 24th, 1859. His bank book was written up and delivered him, with vouchers, from time to time, and when his account was closed and he drew his balance. He kept a book-keeper and books only up to June, 1856. The plaintiff kept memoranda on envelopes; they were burned in the fire of 1862. He testified as to the time of receiving these drafts, from the post marks on the envelopes. He swears : "I had a memorandum of the disposition made of these two drafts  *   *   *   *   had no memorandum of the disposition of these drafts." He apprehended his account was short on first getting his bank book ; he did not recollect the draft had been deposited with the defendant; remembered its history when Barker, the engineer, came ; did not know that he had delivered the draft.

The parties having rested, and the testimony closed, the court charged the jury, and at the conclusion of its charge was requested by the defendant's counsel to further charge that if they found that the plaintiff's bank book was written up from time to time, so as to show the state of the account between him and the defendant, as claimed by the defendant, and was delivered to him with vouchers, it amounted to a stated account, by which the plaintiff was bound, unless he objected to it within a reasonable time ; and that the plaintiff having made no claim upon the defendant until the spring of 1862, he did not object within a reasonable time, and could not, therefore, for that reason, recover in this action. The court refused so to charge, but did charge that the delay in objecting to an account thus made out and stated was to be considered by the jury, in weighing the testimony. The defendant's counsel excepted to the refusal to charge, and to the charge as made.

The defendant's counsel further requested the court to charge the jury that a stated account furnished a merchant or business man by a bank with which he keeps an account must be objected to within a reasonable time, and cannot after that be brought in question, except on the ground of fraud or mistake, which is not this action. The court refused so to charge, but did charge as above; and further, that it was for the jury to determine, upon the evidence, whether the plaintiff unreasonably delayed to assert any error, if there be any error, in the account with the defendant. The defendant's counsel excepted.

The defendant's counsel further requested the court to charge the jury that the closing of the plaintiff's account, finally, with the defendant, on the 24th of August, 1859, and drawing his check for the exact balance at that time, having his bank book written up and balanced and delivered to him with vouchers, was a final settlement, and was conclusive upon the parties, unless for fraud or mistake, which is not this action. The court refused so to charge, but did charge that these facts were to be considered by the jury in weighing the testimony, as before stated; and the defendant's counsel excepted.

The defendant's counsel further requested the court to charge the jury that the entries proved to have been made by the witnesses Watson and Tappan in the books of the defendant, of what they swear they did at the time, were evidence of the fact or facts, and entitled to the same credit as their evidence, although the party making the entries does not now recollect them; and that such entries are more reliable than the recollection of the plaintiff after the lapse of nearly six years. The court refused so to charge, but did charge that such entries were evidence, and were entitled to great weight, but that it was for the jury to say, upon all the evidence, whether they were entitled to more weight than the testimony on the part of the plaintiff. The defendant's counsel excepted.

*C. F. Tabor*, for the appellant. I. The plaintiff's case rests entirely upon his own testimony. Our first point is, that it is not sufficient to sustain the verdict, and that the motion made at the circuit to set it aside should have been granted. (After reviewing the testimony.) The defendant, by the entries in its books, and in those of the Albany Bank, by the facts showing that this draft was sent back to be indorsed, and entries made such as this transaction called for, by the identity of amount, the settlement of the defendant's cash, and other proofs, makes a strong case; in fact, proved every thing possible under the circumstances; and to allow of a recovery against a bank, in such a case, and against such proofs, upon the vague recollection, or pretended recollection, of a party dealing with it, would be dangerous in the extreme. A bank could not, with any safety, pay a draft or a check upon another bank, without taking a voucher for the money.

The case, on the part of the plaintiff, rests upon his testimony, a new species of evidence, until recently excluded as unreliable and dangerous. Now, that it is admitted, it is the duty of courts to scrutinize it with care. This cannot always be expected of the jury.

The plaintiff was called upon, after his continued dealings, frequent settlements, and long delay, without making any claim, to prove his case by substantial, reliable evidence. He has not done it—his testimony will not bear examination. He undertakes, after six years, to remember what he could not remember before, without books or papers, or any thing to aid him, or refresh his memory. The proofs show that he was loose and erratic, without system, or business habits, and the verdict is clearly against the weight of evidence. In such case, this court say, in *Powell* v. *Jones*, (42 *Barb.* 28,) a new trial will be granted.

Where the evidence on behalf of the successful party does not establish the facts constituting his cause of action, or defense, beyond a reasonable doubt, the verdict can not be sustained. (*Sheldon* v. *Hudson River R. R. Co.*, 29 *Barb.* 226.)

To justify a verdict, the law requires not positive proof, but such proof as will leave no reasonable doubt of the existence of the fact upon which it must rest. (*Id.* 229.)

Findings of fact plainly against the weight of evidence should be set aside on review. (*Mathews* v. *Poultney*, 33 *Barb.* 127. *Smith* v. *Tiffany*, 36 *id.* 23.) The case is not one of conflicting testimony where the evidence is nearly balanced, or one of doubt, as to the preponderance ; but the verdict is clearly against the weight of evidence, and upon well established principles the defendant is entitled to a new trial.

II. The court erred in refusing to charge the jury as requested by the first, second and third requests. As to the first, the court erred in refusing to charge that the plaintiff was bound by a stated account, unless he objected to it within a reasonable time. His refusal to charge as requested, with instructions to the jury that it was to be considered by them, was equivalent to charging that a party is not bound by a stated account, if he does not object to it within a reasonable time, but that it is matter of discretion for the jury.

The court erred in refusing to charge the same thing contained in the second and third requests, and also in refusing to charge that it was necessary in the cases specified in these requests, in order that the plaintiff should not be bound thereby to prove fraud or mistake. (*Lockwood* v. *Thorne*, 1 *Kern.* 170. *S. C.* 18 *N. Y. Rep.* 285. 30 *id.* 202.)

The court erred in refusing to charge according to the fourth request, in respect to both of its propositions.

If the requests to charge by the defendant were correct, they should have been assented to by the court. To refuse to charge a proposition where the party is entitled to it, is not cured by further instructions to the jury from the court, should they be held equivalent to what was requested. Such a course is almost certain to prejudice the case, and to mislead the jury.

The charge here will be found incorrect, in both what is charged and refused.

*W. A. Beach,* for the respondent. I. It is questionable, whether the defendant is formally in position to ask a review of the facts by the appellate court. He has no order from which to appeal. The case states that he moved on the minutes for a new trial—that his *motion* was denied, and he excepted. He appeals from that ruling as an order. The practice is exceptional.

II. The issues of fact were submitted to the jury upon conflicting testimony, of which, it may, at least, be said that there was no decisive preponderance in favor of the defense. The case is therefore one of those, where the verdict is conclusive. Upon a former trial, a jury had disagreed. The verdict obtained by the plaintiff was upon a full and deliberate presentation, the parties being aided by the developments and arguments upon the first trial. To justify its reversal upon the proofs, it must appear to be clearly and inexcusably against the weight of evidence. Certainly, this cannot be pretended. It will be seen, I think, that the balance of proof was with the plaintiff. At any rate, it is indisputable that his case was sustained by the positive and unimpeached testimony of himself, and another, which was answered only by inconclusive inferences from the books of the defendant. If it may not be said, that an interference with the verdict, under such circumstances, would be in disregard of evidence, it may be said that it would be a departure from the settled doctrine and uniform practice of this court.

III. The verdict is in decided conformity with the evidence. 1. The ownership in the plaintiff, of the draft, its deposit with the defendant, by the plaintiff, July 24th, 1856, its collection by the defendant, are unquestioned facts. It is undenied, that it was not credited to the plaintiff, on the books of the bank. It is not pretended that it was passed to the defendant, in liquidation of any debt of the plaintiff, or any special account. The sole question is, did the bank pay the plaintiff, over its counter, the amount of the draft, when it was received? The defendant claims that it did so.

The plaintiff avers that it was delivered, and received for collection, denying that the defendant has accounted for the avails. 2. The plaintiff swears, positively and unequivocally, that he passed the draft to the defendant on the 23d or 24th July, 1856, for collection, and that he has not received any credit or payment on account of it. 3. John A. Lynd, who was interested in the draft, by way of security for advances made the plaintiff, swears that on the 23d July, 1856, the plaintiff extinguished his interest in this and other drafts ; that on the 24th July he went to the defendant's bank to indorse the $884 draft, and did so ; that he received no money from the defendant upon it, nor did the plaintiff, in his presence. The plaintiff was uncertain, whether this draft was delivered to the defendant on the 23d or 24th July. The defendant's exchange book shows an item of $884, both on the 15th and 24th July. Lynd swears that he had a settlement with the plaintiff on the 22d July, and that this draft, with another, was received the next day. His recollection as to that, is confirmed by the check given him by the plaintiff. It is certain, therefore, that the entry on the defendant's books of July 15th, had no connection with the draft in question. It is probable that the entry under date of July 24th, represents it, confirming the first impression of the plaintiff, that both the drafts of $853.47, and $884, were delivered to the defendant on the morning of the 24th July. 4. The plaintiff swears, and it is undisputed, that on the 23d July, he requested Watson, the defendant's teller, to furnish him a bank book, embracing all his account. That he then informed the teller that he desired *all his drafts to appear.* The plaintiff then gave a balance check ante-dated to June 23d, a date overreaching all the drafts negotiated with the defendant. It is further undisputed, that such bank book was supplied, commencing June 27th, 1856. And that under date July 24th, 1856, the draft of $853.47 is credited, no credit appearing for the one of $884. It is certain that both these drafts were at the bank on the morning

of the 24th July. The plaintiff and Lynd so testify, and there is no contradiction. How came these drafts, thus associated and connected on the plaintiff's exchange book, separated ? The defendant answers that it paid the money on the one to the plaintiff, at the time. This is contradicted both by the plaintiff and Lynd. It is contradicted, also, by the known custom of all banking institutions, with their regular customers. Drafts deposited, for which money is paid on the instant, are always paid upon the customer's check, and both draft and check entered to his account. Especially would this be so between these parties, the defendant knowing that the plaintiff desired all his drafts entered upon his bank book, and, indeed, that it was procured for that purpose. 5. In answer to this proof, the defendant produces Mr. Watson, its teller, by whom the business was transacted, on its part, who swears that he does not recollect of paying the $884 draft to the plaintiff or Lynd ; that there is no entry on the book which shows that he paid the money on the draft ; and that he can not swear that he did pay it over the counter to the plaintiff, or anybody else. The remainder of the defendant's proof is derived from its books. It is circumstantial and argumentative. The books do not show, by direct entry, or positive deduction, what disposition was made of the $884 draft. It is said that its appearance upon the exchange book indicates that it was regarded as a cash item, and that the proven fact of the correct daily balancing of the cash account necessitates the same conclusion. If the conclusion be conceded, it by no means answers the direct and positive proof of mistake furnished by the testimony of the plaintiff and Lynd, supported by the circumstances before considered, especially as the evidence of the defendant's teller shows that the error claimed by the plaintiff might well exist, consistently with the treatment by the defendant of the draft, as a cash item. In the first place, whatever may be the probability, it is not certain that the item of $884 appearing on the exchange books, under date of July 24, 1856,

consisted of the $884 draft. Mr. Watson swears that he cannot tell of what the item consisted ; that it might be cash for aught he knew. He says this with the books before him, and with knowledge of the defendant's course of business. If nothing more, this proves the unreliability of the books, and in connection with the other testimony of Mr. Watson, before quoted, shows further, that all inferences deduced from the books are uncertain and hazardous. Other testimony of Mr. Watson is significant. He says he means by a cash item, one for which money was paid, or credit given. So that if, by mistake, this $884 draft was credited to the wrong account, treating it as a cash item would produce no confusion or irregularity in the accounts. And Mr. Watson also shows that if it was credited to some other person than the plaintiff, he could not detect it in settling his cash account. The whole argument from the books, and from the accurate balancing of the cash, is answered by the single suggestion, that the draft was erroneously credited to some other account than the plaintiff's. It became, therefore, important for the defendant to show, in aid of its argument from the books, that this credit was not improperly applied. This was entirely practicable. No proof of the kind was given. The books produced did not elucidate the question. It was not even shown that this draft was not credited to Lynd. Such an error might readily occur. He was known assignee of the paper ; his name was upon it ; he was present when it passed to the defendant ; and Mr. Tappan, defendant's cashier, when applied to by the plaintiff concerning the error, claimed that this draft belonged to Lynd. For aught that appears, it may stand credited to Mr. Lynd, and if so, or to any other party, every argument of the defendant is fully answered. This view also meets the argument, vigorously pressed upon the jury, that a verdict for the plaintiff was a substantial conviction of Mr. Watson (the teller) for felonious embezzlement of the amount of the draft. Obviously, no such consequence follows. An innocent mistake, assumed probable in

itself, reconciles all the evidence. But if this judgment conveys imputation upon any officer of the defendant, it is sustained by evidence too credible and irrefragible to be disturbed for that reason; and an argument of this character, quite illogical in itself, is decisively disposed of by the consideration that the success of the defendant would unavoidably impute perjury to the plaintiff, and possibly to Mr. Lynd also.

IV. The remaining question arises upon the charge of the judge, and refusal to charge, presenting, for consideration, the doctrine of stated and settled accounts.

It appeared that the plaintiff first received his bank book from the defendant in August, or September, 1856, although the entries on it commenced in June preceding, at which time he closed his account and drew his balance. And that the plaintiff's first application to the defendant on account of this draft, was some four years afterward, or, possibly, in the spring of 1862. In answer, it was shown that the plaintiff was not familiar with book keeping, and not in the habit of keeping books, and that he kept a book keeper, and books only to June, 1856. That he was a blacksmith by trade, but in 1856 was contractor with the state, for the erection of iron bridges over the Erie and Oswego canals, for which he was paid by drafts, of the character in question. That he received these drafts every month of the year, to the amount, from January to June, 1856, of $30,000. The balance to his credit on the books of the bank, in July, 1856, was $24,281.35, and in August, $5049.17. Under this state of facts, the defendant contended that the account between the parties was so stated, and settled, as to conclude the plaintiff from all allegation of error. On the contrary, the plaintiff insisted that the proof was abundant to carry the question of unreasonable delay in asserting the mistake to the jury. The defendant's first request to charge, required the court to say as matter of law to the jury, " that the plaintiff, having made no claim upon the defendant, until the spring of 1862, he did not object within

a reasonable time, and cannot, for this reason, recover in this action." This the court declined, leaving the question to the jury. Undoubtedly this was a correct disposition of the power, unless the evidence was so decisive, as to justify the court in directing a verdict for the defendant. That part of the first request, preceding the above extract, was entirely unexceptionable, but to sustain an exception, it must be so in all its parts. The court was not called upon to qualify the proposition, by distinguishing the good from the bad, although it did so. (*Doughty* v. *Hope*, 1 *N. Y. Rep.* 79.) The defendant's second request, claimed a ruling to the effect that this action was not so framed that the plaintiff could recover, although he proved a mistake, and reasonable diligence to obtain its correction. The proposition, that a stated account must be objected to in a reasonable time, and could not be questioned but for fraud, or error, was entirely accurate ; but the defendant asked the court to rule that this action did not present the question of an account stated. The complaint alleges that the plaintiff deposited the draft in question, with the defendant for collection ; that the defendant collected it, and never paid the avails to the plaintiff, but converted them to its own use. The answer avers payment, with a general denial. Clearly, the complaint was formally and substantially sufficient to authorize a recovery. It stated, precisely, the facts upon which the plaintiff's claim rests upon the proof. It was not for him to allege a mistake. It is enough that he alleges, and proves, that the defendant, as his agent, collected for him money, for which it has neglected to account. An action within six years entitled him to judgment. It is the defendant who relies upon a stated account. The defense, argumentatively admitting the collection of the plaintiff's money, and failure to account, attempts to bar his action, because he did not claim his money seasonably. It might, with plausibility, have been objected, upon the trial, that the answer avers no such defense. Certainly, the defendant cannot object that it was considered. If otherwise,

the issue of settled accounts, in all its aspects, was litigated without objection, until it came to the requests to charge. After the defendant found the issue to be against it, upon two trials, and full discussion, it attempts to escape it. Under these circumstances, if the pleadings were defective on either side, the court would conform them to the proofs. It will be presumed to have been done in support of the judgment, and if not, will be done on appeal. (*Lounsbury* v. *Purdy*, 18 *N. Y. Rep.* 515, 521. *Bate* v. *Graham*, 11 *id.* 237, 242.)

The third request, is substantially the same as the second. It is submitted, that the single legal proposition debatable, is offered under the first request to charge. The only disputed point arises upon the submission of the question of *delay* to the jury. The court properly instructed them, that the facts showed an account stated; that it was conclusive upon the plaintiff, unless objected to in a reasonable time; and that it was for them " to determine upon the evidence, whether the plaintiff unreasonably delayed to assert any error, if there be any error, in the account with the defendant."

The direction given to the case by the learned judge at the circuit, follows strictly the path of the highest authority. (*Lockwood* v. *Thorne*, 11 *N. Y. Rep.* 170. *S. C.* 18 *id.* 285. *McDougall* v. *Cooper*, 31 *id.* 498.) The opinion of Justice Parker, in the authority first cited, is not as satisfactory as that of Justice Selden upon the second appeal in the same case. Justice Parker (*p.* 173) assumes that the record shows that there was no proof of fraud or mistake, as the case was then presented. And then holds that the question, " whether, on a given state of facts, the transaction amounts to an account stated, is a question of law, and not of fact." This may be conceded, without affecting this appeal. Here, decisive proof of mistake, or fraud, was given, and the only point of law raised was, whether or not that being shown, and long delay in asserting it appearing, it was proper to submit to the jury, upon explanatory testimony, the sufficiency of the

excuse offered for the delay.  Further on, in his opinion, (*p.* 174,) Justice Parker concedes that in the absence of express admission, the conclusiveness of the account depends upon the timeliness of objection to it.  It is true, the verdict for the plaintiff, who claimed the error, was set aside, Justice Parker holding that the delay of nine months, and drawing a draft for the balance, was conclusive evidence, that the plaintiff agreed to the bill rendered, as a stated account.  (*Page* 175.)  But he then says, "the transaction, then, being an account stated, is conclusive upon the parties, unless the plaintiff affirmatively shows fraud, or mistake. * *  Here, no fraud or mistake was pretended."  On the new trial, the plaintiff was nonsuited.  The circuit judge, misapprehending, I think, the opinion of Justice Parker, held the plaintiff concluded by the account, and granted a nonsuit.  (18 *N. Y. Rep.* 287.)  On appeal, the nonsuit was set aside, Justice Selden, with his usual force and precision, (*p.* 291,) announcing the sensible and just rule, that "an account stated, or settled, is a mere admission that the account is correct.  It is not an estoppel.  The account is still open to impeachment, for mistakes, or errors," &c.  (*p.* 292.)  He proceeds to demonstrate that the effect of an account stated, and settled, is a matter of evidence, and depends upon the attendant circumstances.  Justice Pratt, referring to the decision on the first appeal, says, "there is nothing in that decision, however, which would preclude the plaintiff from showing upon the second trial that they did, in fact, object within a reasonable time, or any legitimate cause for not objecting," &c.  (*p.* 290.)  His opinion (*pp.* 288, 289) is equally explicit, in considering the whole question one of fact, to be settled upon consideration of all the circumstances.

The case of *McDougall* v. *Cooper,* (*supra,*) is still more decisive.  There a note was given on the settlement of accounts, and afterwards paid.  The plaintiff sued as assignee in trust.  The defendant was allowed to show mistakes without any explanation whatever, qualifying the effect of the settlement,

and note given.   The time that had intervened does not distinctly appear.   The report does not show when the suit was commenced.   The settlement was in May, 1848.   Judge Denio's dissenting opinion states, (*p.* 503,) that evidence was given of a paper executed in 1852.   The suit was, therefore, four years after the settlement.   The court says, (*p.* 499,) " The principal issue of law was, admitting that there were errors, omissions or mistakes, on such accounting, was not the plaintiff barred and precluded from opening the account, and receiving any balance found due by reason of such omission, or mistake, by the duebill given, and the receipt thereon ?" And it sustained the finding of the referee, allowing the mistakes.   This was in March, 1865.   In the following year, (March, 1866,) in the Supreme Court, in the seventh district, the same doctrine was affirmed, although the court set aside the judgment upon the evidence.   In that case the delay was nearly six years ; and yet the court held the account open to impeachment, without hinting at the necessity of explaining the delay.   (*Towsley* v. *Denison, 45 Barb.* 490.)

It would seem clear that no error, prejudicial to the defendant, occurred upon the trial.   It may be doubted if a party prosecuting within the statute of limitations for money due, is, under any circumstances which do not amount to an express agreement, or an *estoppel in pais,* barred of his right by an account stated and settled, which is clearly shown to be erroneous.   Such an estoppel rests upon no principle of law or equity.   Why should the party to whom money is justly due be estopped by an error to which he has not understandingly agreed, and out of which no equity has arisen in favor of his adversary ?   Suppose the error was seasonably discovered, or ought to have been, and the claimant was dilatory and negligent in obtaining its rectification, yet if he acts before he is bound by the statute, what conceivable reason can be given why he should not assert the mistake ?

It may be said that parties rely upon closed accounts— that they become stale and forgotten—and injustice may

follow their opening. These are considerations relating exclusively to matters of evidence, and requiring more satisfactory proof of mistake. But the mistake being shown, nobody can maintain otherwise than as an arbitrary and senseless dictum, that it ought not to be rectified, because .the wronged party has delayed the assertion of his right. The statute of limitations is the only bar, and that is arbitrary. Time does not sanctity error and wrong. The statute is peremptory; but short of that, there is no mere delay, unaccompanied by agreement or equitable estoppel, which bars any demand of this nature.

At all events, it does not when it is explained and shown, as in this case, not to have been an acquiescence in a known mistake, ripening into an implied agreement, but an excusable delay, founded in ignorance of the truth, and occupied in fruitless but ceaseless efforts to ascertain it.

HOGEBOOM, J. The defendant's counsel made four several requests to charge the jury, which it may seem better, to illustrate the case, first to consider.

The request to the court to charge absolutely that the entries by Watson and Tappan in the books of the bank were more reliable than the testimony of the plaintiff, after the lapse of six years, was properly refused, and it was properly left for the jury to say, upon all the evidence, which was entitled to the greater weight. This is so obviously the correct rule that it scarcely needs illustration. A contrary instruction, if positive and absolute, would probably have entitled the plaintiff, if defeated, to a new trial.

The second and third requests are faulty, I think, for containing the clause "which is not this action." If by that it was meant that it was not competent for the plaintiff to raise the question of fraud or mistake, because it had not been made as a distinct issue in the pleadings, the position was not well taken. The plaintiff could doubtless have framed a complaint alleging in terms that there had been an account

Hutchinson *v.* Market Bank of Troy.

stated between the parties, and setting forth circumstances of fraud or mistake therein as a ground for opening the same and reinvestigating the items thereof. And a denial of the allegations would have raised an issue upon which the parties might have gone to trial and introduced, probably, nearly the same evidence which they brought forward on this occasion. Or, the plaintiff might properly, I think, as he has done in this case, have framed his complaint to recover a specific sum—a single item—claimed to have been owing from the defendant to him ; leaving the defendant to set up a denial, or a payment, or an account stated, as the fact might be. A statement of the latter fact would be *presumptively* a bar, and would throw upon the plaintiff the necessity—if he wished simply to deny that there was an account stated—of raising that question, by an omission to reply, or by a reply containing a general denial of the answer ; or if he wished to open the account to re-examine the items on the ground of fraud or mistake, to amend his complaint or reply specially by permission of the court, setting up circumstances of fraud or mistake, in the nature of a *surcharge* or *falsification*, according to the practice of a court of equity. In this particular case, the claim being for an *omitted credit*, it would have been in the nature of a *surcharge*. But the defendant did not adopt this course, and interposed simply the defenses of a *general denial* and *payment*. Under issues thus framed, the parties have *mutually* and *without objection* gone into the whole evidence in the case. It is not, I think, for the defendant to complain that this has been done. *Perhaps* the plaintiff might have objected that if the defendant wished to rely upon an account stated, he should have interposed it as a *specific defense*. But the question does not arise. Both parties have investigated the whole case, on the trial, with the utmost freedom, and without a particle of objection, and they cannot now be allowed to say this is not a case, *upon the pleadings*, for examining the question of fraud or mistake.

If he intended by this language, " *which is not this case,*" to say it was not a case of fraud or mistake upon the *evidence*, that is that the *evidence* did not exhibit *any* circumstances tending to show *mistake*, I think the objection was not well founded in fact, so far as to prevent their submission to the jury, and therefore a compliance with it was properly refused.

I have more doubt about the *first* request, and whether the judge, at the circuit, ought not to have granted it. It consisted of two propositions : 1st. That if the plaintiff's bank book was written up from time to time, so as to show the state of the account between the two parties, and delivered to him (the plaintiff) with vouchers, it amounted to a stated account *by which he was bound,* unless he objected to it within a reasonable time ; and, 2d. That the plaintiff having made no claim upon the defendant until the spring of 1862, *he did not object within a reasonable time,* and could not therefore, for that reason, recover in this action.

The plaintiff's counsel pronounces the first branch of this request " entirely unobjectionable," but attacks the latter as unsound. I regard the plaintiff as without any reasonable excuse for allowing the matter to be so long unquestioned. His bank book was written up as early as August or September, 1856, and balances struck, and the vouchers delivered up, repeatedly afterwards, until 1859, when he drew out of the bank the balance remaining to his credit. In September, 1856, he knew, or with reasonable attention might have known, and was bound to know, that the draft in question was not credited to him on the books of the bank. It is no sufficient apology for his remissness to say he was not learned, or was otherwise employed. He was bound, by all the rules which regulate commercial transactions, to give attention to this business, and if necessary, to obtain the services of a competent assistant for the purpose. If he was not persuaded of a fact of which on this trial he was so positive—that the paper had come into the possession of the defendant—that is another question. That casts a doubt over his accuracy in

Hutchinson *v.* Market Bank of Troy.

the whole transaction. But even that is but a lame apology for letting the matter lie till the spring of 1862, before he brought it to the notice of the bank. Upon all the principles applicable to transactions of this kind, this was, in my opinion, clearly a *stated account*, not objected to within a reasonable time ; so plainly so, that it was not, under the evidence, a question proper for the consideration of the jury whether the delay was sufficiently accounted for.

Differing on this point from the judge who presided at the trial, let us see whether the defendant has taken any available exceptions on this branch of the case. It has excepted to the charge of the judge that the delay in objecting to an account thus made out *and stated*, was to be considered by the jury in weighing the testimony. In this there was no error. It was to be considered, and very seriously considered ; so much so as to throw great discredit upon the plaintiff's case. The charge, in this clause of it, was not equivalent to a submission of the question to the jury to determine whether the delay was so unreasonable as to forbid a recovery by the plaintiff. That, I think, would have been error, but not to say to them, in effect, that the delay in objecting to the account detracted from the strength of the plaintiff's case. In the refusal to comply with the second request, the judge laid down the rule more broadly, and, as it seems to me, erroneously, in saying "it was for the jury to determine upon the evidence whether the plaintiff unreasonably delayed to assert any error in the account with the defendant." But I find no specific exception limited to this clause of the charge. The case states, immediately after the last sentence, "and the defendant's counsel then and there duly excepted." But the previous sentence, to which that exception is applicable, contains not only the clause above quoted, but a refusal to charge, and a charge in both of which the judge was, in my opinion, correct. The exception must therefore fail, *for being too comprehensive.*

The first branch, and the latter part of the second branch,

of the request, asked the judge to charge that under such circumstances, the plaintiff was bound by the stated account, (that is as I understand it) *absolutely* and *conclusively* bound. and could not recover. I think this was a more rigid penalty than the law imposed. The true rule is more nearly stated in the second and third requests, that the stated account becomes conclusive upon the parties unless impeached for fraud or mistake. In the language of the opinion in *Lockwood* v. *Thorne,* (11 *N. Y. Rep.* 175,) " the transaction then being an account stated, is conclusive upon the parties, unless the plaintiff affirmatively shows fraud or mistake." So in Judge Selden's opinion in the same case, in 18 *N. Y. Rep.* 292 : "An account stated or settled is a mere admission that the account is correct. It is not an estoppel. *The account is still open to impeachment for mistakes or errors."* " But the parties are never precluded from giving evidence to impeach the account, unless the case is brought within the principles of an estoppel *in pais,* or of an obligatory agreement between the parties ; as, for instance, when upon a settlement mutual compromises are made." (*See further, Murray* v. *Toland,* 3 *John. Ch.* 569 ; *Wilde* v. *Jenkins,* 4 *Paige,* 481 ; *Philips* v. *Belden,* 2 *Edw.* 1.)

The result is that a stated account never gives to a party claiming under it the benefit of an absolute estoppel, and in practical effect gives him little more than these two advantages : 1st. When the question arises upon the pleadings, the court has, in some instances, in granting permission to amend or reply, some equitable control over the power of opening the accounts. 2d. When the question arises upon the trial the party impeaching the account has the affirmative of the issue, and the burthen, and sometimes an oppressive burthen, of proof. These are considerable advantages, but they come very far short of placing the adverse party under the bar of an absolute estoppel. On the whole, therefore, I think this request, for the reason just stated, was also properly refused.

Nor do I think, whatever may be our opinion of the merits of the case, that we can consistently with the rules of law, grant a new trial upon the ground that the verdict is against the weight of evidence. 1st. The plaintiff—and to some extent he is corroborated by Lynd—swears explicitly that he delivered this draft to the defendant, and that he has never had from it either payment or credit. None of the officers of the bank swear explicitly that this is not so, and all were not examined upon this subject who might have been. The lapse of time, and the stated account, are strong circumstances against the plaintiff ; but we can scarcely say, under the positive testimony of the plaintiff, that the bank has had the draft and has not accounted for it, and a failure to contradict it by testimony equally explicit, that the weight of proof is so clearly with the defendant as to require us to set aside the verdict.

2d. This draft is clearly enough traced into the possession of the defendant. The plaintiff swears to it, and the defendant does not deny it. It is highly probable, not to say absolutely certain, that it passed between the defendant's bank and the Bank of the Capitol, at Albany. The respective theories in regard to it are, 1st, that of the plaintiff, that it was received by the defendant for collection and never accounted for ; and 2d, that of the defendant, that it was received as cash, and accounted for at the time. There certainly are some circumstances tending to show that the plaintiff is mistaken in supposing that it did not go into the hands of the bank till the 23d or 24th of July ; for an item of precisely that amount passed on the 15th from Troy to Albany, in the exchanges between the Market Bank and the Bank of the Capitol, and it was entered in the exchange account and not on the tickler, indicating it to be a cash item. And to make that more absolutely certain, it would have been more satisfactory if the defendant had given evidence to show that the item did not, after the 24th, again appear on its exchanges with the Bank of the Capitol. Indeed I think it somewhat

remarkable that the case does not explicitly state, and that proof was not given, that no further or other account of this item appears on the books of the bank, or that the state of the account of Lynd, as well as of Hutchinson, and perhaps that of some other parties, was not examined at about that period of time—from the 15th to the 25th of July—for the purpose of ascertaining whether by possibility some mistake had not occurred, in regard to the disposition of this item, which would tend to promote justice between these parties.

The theory of the defendant is that this draft may have been, though not sworn to that it actually was, treated as a *cash* item, and paid over the counter of the bank to the plaintiff, in cash, and not in any way entered or necessary to be entered on the books of the bank. And it would not have been improper, or unnatural, so to have entered it. It was very likely to be so entered, as the plaintiff was an habitual dealer and customer at the bank, making frequent if not daily deposits and drawing frequent if not daily checks. I think there is no evidence to show that in any other instance the defendant paid any of the canal drafts to the plaintiff in that way. And the draft of $853.49 which, as the defendant says, was treated by the bank as a cash item, was nevertheless credited to the plaintiff on the books of the bank.

3d. There are undoubtedly some difficulties in sustaining the theory of the plaintiff, and some improbabilities in some of the circumstances testified to, and great lapse of time allowed to occur before an investigation is demanded; but there are also counter difficulties and counter improbabilities in the theory of the defendant—an absence of positive testimony—and a lack of that full examination and presentation of facts which, I think, the circumstances of the case called for.

The case has been once tried without reaching a verdict, and again tried with a result unfavorable to the defendant. I am not prepared to say that we ought to interfere to set that verdict aside. The case, in any aspect of it, is attended

with doubts and uncertainties, and the plaintiff has this advantage in the clearly established facts of the case, that the draft belonging to him went into the defendant's possession.

I think the verdict cannot be disturbed, and that the judgment must be affirmed.

MILLER, J. I think that no error of law was committed upon the trial of this case. And although not entirely satisfied with the verdict of the jury, I do not well see how, according to well settled rules of law, it can be disturbed. I therefore concur in the result of the foregoing opinion.

PECKHAM, J. dissented.

Judgment affirmed.

[ALBANY GENERAL TERM, March 4, 1867. *Peckham, Miller* and *Hogeboom,* Justices.]

————•••••————

48 327
122a 157
48 327
86h 260

MARGARET WILCOX, adm'r of Milton P. Wilcox, appellant, *vs.* CATHARINE WILCOX and others, respondents.

The law will not imply a promise to pay for board or services, as among members of the same family, and persons more or less intimately or remotely related, where they are living together as one household, and nothing else appears.

One tenant in common, although he have the exclusive possession of the common property, is not liable to account to the other tenants in common either for rent or for a share of the profits; unless there be an express agreement that he shall do so.

Where a married woman is a tenant in common with others of property occupied by her and her husband, his occupation being that of his wife, no action will lie against him by the other tenants in common, for rent, without proof of an agreement to pay it.

THIS is an appeal from the final decree of the surrogate of Monroe county, settling the accounts of Margaret Wilcox, as administratrix of Milton P. Wilcox, deceased, in which her rights and duties as such administratrix, and

as heir at law of her father, Isaac B. Cole, and as legatee in his will named, are involved, and were necessarily passed upon by the surrogate. Isaac B. Cole died at Perinton in the year 1862, leaving a will, and leaving Cynthia Cole, his widow, Henry Cole, his son, and Margaret Wilcox, his daughter, and heirs at law, and legatees named in his will. Margaret, at the time of her father's death, had been married to Milton P. Wilcox, the intestate, for several years, and had never left her father's house; her husband went into Cole's family and lived there, with his wife. For the last two years of Cole's life he also had a horse kept there by Cole. After the death of Cole, the intestate went on to the farm by and with the consent of all the owners, Mrs. Cole, Henry Cole and Mrs. Wilcox, under no specially expressed bargain. Milton P. Wilcox died intestate in the year 1864, leaving Margaret Wilcox, his widow, but no children, but leaving the respondents, who were his brothers and sisters, his heirs at law. Mrs. Cynthia Cole became the administratrix of her husband, I. B. Cole, and presented to Margaret Wilcox, as the administratrix of Milton P. Wilcox an account against the estate of Wilcox, which included an item for board and horse keeping, $800 and interest. This item Mrs. Wilcox paid by giving her note, and took a receipt, and presented it as one of the items against the estate of her husband; but it was disallowed by the surrogate. Another item in the account of the administratrix of Wilcox was a claim of $1593 for the rent of the farm two years, while it was occupied by Wilcox, with interest.

Mrs. Wilcox and her brother Henry had bought this claim from Mrs. Cole and taken an assignment of it, and presented that as a claim against the estate, including her proportion of the rent. This was also disallowed by the surrogate, as to so much as was claimed for Mrs. Wilcox.

From the decision of the surrogate in these two matters Mrs. Wilcox appealed to this court.

*Wm. C. Rowley,* for the appellant.

*J. L. Angle,* for the respondent.

*By the Court,* E. DARWIN SMITH, J. The surrogate was clearly correct in disallowing the claim of $800 for board and horse keeping. The proof showed that upon the marriage of Milton P. Wilcox with Margaret Cole he lived at his wife's father's and made it his home there, by invitation and common consent, without any claim, suggestion or expectation by any one that he was to pay for the board of himself and wife. No agreement for board is proved; and without an express agreement to pay for board no legal claim arose, and none should be recognized or allowed, under such circumstances. The case of *Robinson* v. *Cushman,* (2 *Denio,* 153,) fully asserts this principle, and it is eminently sound and just. The law will not imply a promise to pay for board or services, as among members of the same family and persons more or less intimately or remotely related, where they are living together as one household, and nothing else appears. (*Williams* v. *Hutchinson,* 5 *Barb.* 124. 17 *Verm. R.* 556. 16 *id.* 150. 3 *Cowen,* 612. *Dye* v. *Kerr,* 15 *Barb.* 444.)

The surrogate also correctly held that the claim of the heirs and devisees of I. B. Cole, for rent of the farm occupied by Wilcox, was not recoverable, so far as related to the one third of the amount claimed by the appellant; and for the same reason he should have disallowed such claim so far as related to the residue of such claim for rent. No portion of such item for rent should have been allowed. Wilcox occupied the farm in the right of his wife, who was a tenant in common with Cynthia and Henry Cole. His occupation was her occupation, and as no action would lie against her for such occupation, it would not lie against him, without proof of some agreement to pay rent. The surrogate held the law to be—and in this he was clearly right—that one tenant in common, although he have the exclusive possession

of the common property, is not liable to account to the other tenants in common either for rent or for a share of the profits, unless there be an express agreement that he shall do so. (*Henderson* v. *Eason,* 9 *Eng. L. and Eq.* 339. *Woolever* v. *Knapp,* 18 *Barb.* 265. *Dresser* v. *Dresser,* 40 *id.* 300.)

It appears that on the decease of the father of Mrs. Wilcox the remainder of the family, consisting of her mother and one brother, all lived together on the farm, and the intestate Wilcox carried on the farm. This was at the request and by the advice of Cole, the father of the appellant, in his lifetime, and apparently by common consent and for the common benefit, so far as they all lived upon the farm and from the farm. Wilcox did not become liable to pay rent because he was there employed in preserving the common property and cultivating the farm in the right of his wife, because the head of the household, for the common benefit of all the parties interested in the property upon the decease of the appellant's father. This whole claim for rent should have been disallowed, and as the respondents make this claim in their answer to the petition of appeal under rule 44, the decree can be so modified, and with this modification it should be affirmed, with costs to be paid by the appellant.

[Monroe General Term, March 4, 1867. *Welles, E. Darwin Smith* and *Johnson,* Justices.]

---

## McKechnie and others *vs.* Sterling.

An absolute contract for the sale of an interest in land, authorizing the purchaser to take immediate possession, the consideration to be paid on demand, vests in the purchaser the equitable interest in the land the moment it is executed and delivered.

Such an agreement is not a covenant for the immediate possession, or a condition therefor, the breach of which will avoid the contract.

The destruction of the building on the premises, by fire, after the making of such a contract, is no defense to an action for the purchase money; the purchaser being the owner thereof, and having an immediate interest therein.

APPEAL by the defendant from a judgment entered on the verdict of a jury. The action was brought to recover the sum of $200, the consideration agreed to be paid by the defendant on the purchase of an interest in real estate. The plaintiffs, in their complaint, alleged that on or about the 3d day of June, 1862, the plaintiffs being the owners of a certain building situated upon premises of Caroline and Julia W. Jackson, on the east side of Main street in the village of Canandaigua, and being the holders of a lease of said lot for the ground rent of $70 per year, payable semi-annually, which lease extended for the period of two years from the first day of March, 1860, the rent to commence from the 17th of April, 1860, and which lease had been extended for the period of one year from the first of March, 1862; and being copartners, doing business under the name, firm and style of J. & A. McKechnie, made and entered into an agreement and contract of sale with the defendant, signed by the parties, of which the following is a copy:

" This agreement, made this 3d day of June, 1862, between James McKechnie and Alexander McKechnie, of Canandaigua, Ontario county, New York, of the first part, and Stephen L. Sterling of the same place, of the second part, witnesseth, that in consideration of two hundred dollars agreed to be paid by the said Sterling, the parties of the first part do hereby agree to convey to said Sterling all their right in the property now owned and rented by the parties of the first part, and occupied by J. G. Wilson for a meat market, on the east side of Main street, nearly opposite from Chapin street in the village of Canandaigua, and hereby authorize him to take possession of said premises and building immediately. In witness," &c.

That at the date of said agreement the said building and premises were occupied by one J. G. Wilson as recited in said agreement; that the defendant made said purchase, agreeing to take the risk of obtaining the unexpired right and possession of the said premises from said Wilson; that very soon after the making of said agreement, the defendant

made arrangements with Wilson, by which the defendant was let into full possession of the said building and premises, and the plaintiffs have not since had the enjoyment, or occupation, or rents or profits of the same, or any part thereof. That after the making of said agreement, and on or about the 18th of August, 1862, they tendered to the defendant a release and quit claim of all their interest in said premises and property, and an assignment of the unexpired term of said lease so held as aforesaid, and demanded of the defendant the payment of said sum of $200, which he refused to pay, and refused to accept said release and assignment, or in any manner to comply with the said agreement on his part ; that the plaintiffs have fully performed said agreement on their part, and in consequence of such refusal on the part of the defendant, the plaintiffs have been compelled to pay and have paid the rent for said premises for the remainder of the said term, from June 3d, 1862, to March 1st, 1863, amounting to $52.50, which, by the terms and true intent of the said agreement, the defendant should have paid, and which, together with the said $200 and the interest thereon, the defendant, though often requested, has refused, and still refuses to pay to the plaintiffs.

Wherefore, the plaintiffs demanded judgment and claimed to recover of the defendant $200 and interest from the 3d of June, 1862, and $52.50, with interest from the 1st of March, 1863, besides costs.

The defendant, by his answer, admitted the making of the agreement, and that at the date of said agreement the building and premises were occupied by J. G. Wilson, but the defendant denied that he made said purchase agreeing to take the risk of obtaining the unexpired right and possession of the premises from Wilson. And he further expressly denied that, very soon after the making of said agreement, or at any time, the defendant made arrangements with Wilson by which he was let into full possession of said building or premises, as alleged in the complaint. And the defendant alleged that he never, at any time, had any possession whatever of the

said building or premises. That soon, and within a day or two after the making of the said agreement, the defendant called upon Wilson, and requested him to surrender and give up possession of the said building and premises to this defendant, which Wilson refused to do, claiming that he was under no obligation to leave, and could not be compelled to leave the same under six months.

That within about four or five days after the making of said agreement and while Wilson was still in possession of the said building and premises, and refusing to give up the same, as aforesaid, the building accidentally took fire and was burned up, by which said agreement was rendered utterly worthless to the defendant, he not being able up to that time to get any possession or use of the said building or premises, they being utterly valueless and useless to the defendant for such unexpired term without such building. The said defendant admitted that, after the making of said agreement and on or about the 18th of August, 1862, the plaintiffs tendered to him papers purporting to be substantially a release of their interest in said building and premises, and an assignment of the unexpired term of a lease by which they claimed to hold said premises, and demanded of the defendant payment of the said $200, which he refused to pay, and refused to accept said relesse or assignment on the ground that he had not been able to obtain possession of said premises or building as aforesaid. And the defendant further answering, alleged that before the burning of said building he duly notified the plaintiffs of the refusal of said Wilson to give possession of said premises, as hereinbefore stated ; but they neglected to give the defendant such possession, and took no steps to compel the said Wilson to give possession.

On the trial, the jury, under the direction of the court, found a verdict for the plaintiff for $310.69.

*Spencer Gooding,* for the appellant.

*E. G. Lapham,* for the respondent.

*By the Court,* E. DARWIN SMITH, J.   By the contract be-
tween the parties of the date of June 3d, 1862, the plaintiffs
agreed to sell, and the defendant to purchase all the right of
the plaintiffs in the premises therein described, for the con-
sideration of $200.   The plaintiffs had a leasehold interest
in the premises, subject to a rent of $70 per annum, which
term would expire on the first of March thereafter, with
the privilege of a renewal for two years longer, from the
said first of March.   The building on the premises was
erected by the plaintiffs, but it does not appear that they had
any right to remove it from the demised premises at the end
of the term.   It was, therefore, a fixture attached to the
freehold, and was part of the realty.   The agreement between
the parties was, therefore, a contract for the sale of an inter-
est in land.   The defendant was authorized to take imme-
diate possession.   The payment of the consideration was to
be made upon demand, as no time was fixed for its payment.
Strictly, perhaps, the plaintiffs could not have required pay-
ment till they tendered an assignment of the lease, and gave
the defendant possession.   The contract, however, was abso-
lute, and vested in the defendant the equitable interest in the
land the moment it was executed and delivered.   (*Moore* v.
*Burrows, and Adams* v. *Green,* 34 *Barb.* 173 *and* 183.)
This action is for the $200 consideration money specified in
the contract, and the plaintiffs showed at the trial that they
had tendered an assignment of their lease of the premises and
also a quit claim deed thereof in execution of the contract,
and demanded payment.   The defendant showed nothing in
the shape of a defense to the action, at the trial.   It is true,
he did not get possession, and could not for several days after
the execution of the contract ; but that did not avoid the
contract.   He purchased the plaintiffs' interest in the land as
it was at the time, and was content to take the contract with
a provision authorizing him to take immediate possession.
This was not a covenant for the immediate possession, or a
condition therefor, the breach of which avoided the contract.

The destruction of the building by fire, after the making of this contract, was no defense in the action. In *Sugden on Vendors, p.* 254, it is said, " that a vendee being the equitable owner of the estate from the time of the contract of sale, must pay the consideration for it, although the estate itself be destroyed between the agreement and the conveyance ; and on the other hand, he will be entitled to any benefit which may accrue to the estate in the interim," and cites 2 *Powell on Contracts,* 61 ; *Paine* v. *Meller,* (6 *Vesey Jr.* 349 ;) *Poole* v. *Sheyold,* (2 *Bro. C. C.* 118 ;) *Real* v. *Hussey,* (2 *Ball & Beatty,* 280 ;) and *Harford* v. *Pumes,* (1 *Madd.* 532.) Vide also *Fry on Specific Performance,* § 600, and *Story's Eq.* §§ 101, 102. In *Paine* v. *Miller, supra,* Lord Eldon said of the vendee in such cases : " If the party, by the contract, has become in equity the owner of the premises, they are his to all intents and purposes. They are vendbile as his, chargeable as his, capable of being encumbered as his ; they may be devised as his ; they may be assets, and they would descend to his heirs." Another consideration in support of this view, is that the vendee has an insurable interest in the premises after the contract of sale, and might have protected himself by an insurance ; and if the vendor retaining the title for his security has also a policy of insurance on the buildings on the premises, such policy would be merely a collateral security, and in case the building was destroyed by fire, the insurance company paying the loss would be entitled to an assignment of the debt, and to be subrogated to his rights. (*Angell on Fire Insurance,* § 66. *McGivney* v. *Phenix Fire Insurance Company,* 1 *Wend.* 85. *Etna Fire Insurance Company* v. *Tyler,* 16 *id.* 385.) If this contract had been a lease of this building, then this consequence would not follow. The landlord would be bound to give possession before the estate would vest, or term commence, and until that was done the lease would be a mere executory contract, as was held by this court in *Wood* v. *Hubbell,* (5 *Barb.* 604 ;) or if it had been a sale of personal

---

Gilmore *v.* Jacobs.

---

property, the plaintiff would be bound to make delivery before the title would vest, and in the meantime the property would be at his risk. (2 *Kent's Com.* 2d ed. 367. 9 *Dowl. & Ry.* 276. 7 *East,* 558, *and* 11 *id.* 210. *Thompson* v. *Gould,* 20 *Pick.* 139.) I do not see why the motion for a new trial must not be denied, and judgment be ordered upon the verdict.

New trial denied.

[MONROE GENERAL TERM, March 4, 1867. *Welles, E. D. Smith* and *Johnson,* Justices.]

---

JOHN GILMORE <em>vs.</em> ELIZA JACOBS, impleaded, &c.

The general power of amendment, given to courts of record in sections 172 and 173 of the Code, does not belong to justices' courts; nor do any of the general provisions in relation to the amendment of process and pleadings, contained in other parts of the Code and in the Revised Statutes, apply to justice's courts.

Where the summons, in a justice's court, is sued out and served upon two defendants, the name of one of them cannot be dropped, in the subsequent proceedings, without leave of the court. But if the justice permits the plaintiff to declare against one of two joint defendants, only, he will be deemed to have allowed an amendment of the summons, for that purpose, if he had any power to do so.

A justice of the peace has no power to grant an amendment allowing the plaintiff to strike out the name of a defendant from the summons, after service thereof, and to proceed to trial and judgment against the other defendant, alone.

THIS is an appeal from a judgment of the Cayuga county court affirming the judgment of a justice's court. The action was brought before a justice of the peace, against two defendants, viz. *Roswell R. Jacobs* and *Eliza Jacobs.* At the joining of issue, the plaintiff, in his complaint, stated that he asked leave to withdraw the name of the defendant Roswell R. Jacobs, and proceed against the defendant Eliza Jacobs. The court made no ruling striking out the name of

said defendant, or allowing the plaintiff to withdraw the same. On the adjourned day, and before any evidence had been given on the trial, the defendant, Eliza Jacobs, raised the objection that it was unlawful for the plaintiff to withdraw the name of one defendant, as he asked to do in his complaint, and proceed against the other defendant. The court overruled the objection, and proceeded to trial and judgment against Eliza Jacobs alone. Judgment was rendered by the justice, in favor of the plaintiff, against the defendant Eliza Jacobs, for $16.34, damages and costs. On appeal to the county court, the judgment was affirmed.

*H. V. Howland,* for the appellant.

*Geo. Rathbun,* for the respondent.

*By the Court,* E. DARWIN SMITH, J. The defendant had a separate estate, and her husband was without means or credit, and there is considerable evidence and, I think, a decided balance in the weight of testimony tending to show that she contracted the debt for the wood in question, and that the same was sold to her, and on the credit of her separate estate; and the jury having in effect so found by their verdict, it cannot be disturbed on the ground that it was unwarranted by the evidence. On the merits, the verdict, I think, is clearly right. The only question in respect to the correctness of the judgment is whether the plaintiff was entitled to declare at the trial against Mr. Jacobs alone; the summons for the commencement of the action having been sued out against and served upon her and her husband Russell Jacobs. The justice does not appear to have made any formal decision upon the question of allowing the plaintiff to proceed against one defendant alone, but I think he must be deemed to have allowed an amendment of the summons for that purpose, if he had any powers to do so, because he did allow the plaintiff to declare

against Mrs. Jacobs singly, notwithstanding the objection of misjoinder with her husband was made at the time, and afterwards at the trial, and proceeded to try the cause as though she were sued alone as a single defendant, and rendered judgment against her as a sole defendant. A justice's court being a court of special and limited jurisdiction, has no powers except those expressly conferred upon it by statute.

The general power of amendment given to courts of record in §§ 172 and 173 of the Code, does not belong to justices' courts, nor do any of the general provisions in relation to the amendment of process and pleadings, contained in other parts of the Code and in the Revised Statutes, apply to justices' courts. (*Webster* v. *Hopkins,* 11 *How. Pr. R.* 140. *Perkins* v. *Richmond,* 17 *id.* 312. *Gates* v. *Ward,* 17 *Barb.* 424.) In this court a plaintiff could not amend his summons, so as to leave out the name of one of the defendants, before the Code, and cannot now, without leave of the court. (*Russ* v. *Spear,* 3 *Code Rep.* 189. 1 *Code Rep.* 157 *N. S. and Dibble* v. *Mason,* 1 *id.* 37.) The name of Jacobs could not therefore be dropped in the proceedings before the justice without leave of the court, and as it was done, leave must be considered as granted. The question is, then, had the justice any power to grant such an amendment? I cannot find that the justice has any such power. It is not expressly given to justices of the peace, in any provisions of the justices' act, and therefore justices' courts cannot possess or exercise any such power. The case of *Gates* v. *Ward,* and *Webster* v. *Hopkins,* deny such right. These are both general term decisions of this court, and we feel bound to follow them. We must therefore hold that the justice had no right to strike out the name of Russell Jacobs from the summons and sever in the action after summons served upon both the defendants; and the judgment for this reason should be reversed.

[MONROE GENERAL TERM, March 4, 1867. *Welles, E. Darwin Smith* and *Johnson,* Justices.]

### BLISS vs. SCHAUB.

The Supreme Court, on appeal, can review a judgment of a county court rendered on appeal from a justice's court, on exceptions that are made a part of the record, though the exceptions have been passed upon in the county court, on a motion made in that court for a new trial.

One digging a hole in a public street, and leaving the same open and unprotected or unguarded, is liable for injuries to others, arising from his negligence.

A person in the possession of, and using, property as a bailee for hire, may recover damages for an injury thereto.

APPEAL from a judgment entered on the verdict of a jury, on the trial of an issue of fact, in the Wayne county court. The case came into the county court on appeal from a justice's court, where the plaintiff recovered a judgment for $160, damages and costs. The plaintiff alleged, in his complaint, that on or about the 24th of June, 1865, the defendant caused to be excavated and opened in and through a public street in the village of Clyde, known by the name of Ford street, in and upon which the people and public are used and accustomed to travel and may of right lawfully travel with teams and carriages, a deep excavation or hole about twenty feet long, twelve feet wide and fifteen feet deep; and negligently and carelessly left and permitted the said deep excavation to be and remain open and unguarded in said street, and negligently and carelessly neglected to put or keep any guard, barrier or protection of any kind around or over said deep excavation to prevent travelers' horses and carriages from falling therein. That on or about the day and year above mentioned, and while said excavation was so negligently and carelessly allowed to remain open and unguarded as aforesaid, and whilst the plaintiff's wife and servant was driving his (the plaintiff's) horses and wagon in and along said street near said excavation, the said horses and wagon accidently and unavoidably, and without fault or negligence on the part of the plaintiff, backed and fell into said excavation, and thereby the said horses were greatly bruised, maimed and injured; and the said wagon broken

and damaged; wherefore the plaintiff demanded judgment against the defendant for the injury and damage aforesaid, to the amount of $200.

The defendant in his answer denied the allegations of the complaint, and alleged that the plaintiff was guilty of carelessness and negligence on his part in the management and control of his team on the occasion mentioned in the complaint, which prevented his recovery. He further alleged that on or about the 24th day of July, 1865, he, the defendant, was in the employ of the state of New York, and as such employee of the state was engaged in and about the work described in the complaint, and prosecuted it under the direction and control of the state, and all that was done or left undone upon said work, was strictly in compliance with his (the defendant's) directions received from his employers, the state of New York, through the board of canal commissioners of said state, whereupon he claimed judgment for his costs and disbursements.

On the trial in the county court, the plaintiff, by his counsel, in opening the case to the jury, claimed as follows : for damage done to a span of horses, wagon and harness, by getting into a ditch on what is called Ford street, in the village of Clyde, which the defendant was digging for the state. The defendant commenced the work in 1864, and worked it through to Ford street. In the spring of 1865, it was found that the ditch had been stopped up ; the defendant dug a hole to clean out the obstructions, and left it open for some time, and David S. Gordon drove the plaintiff's team to Clyde, and drove them in between Mr. Stevens' malt house and a brewery, for the purpose of watering them, which was on the south side of Ford street, and nearly opposite the hole made by the defendant. After Gordon had driven the team in there, he got out of the wagon, leaving the lines in the wagon, and left the team without tying, and went to get some water for them, and while after the water, the team

commenced backing, and backed into the hole. Gordon saw the team backing up, and ran and caught the near horse by the bits, and tried to stop them, but was unable to do so. It was the duty of the defendant to have kept the hole protected.

Upon which said opening and statement to the jury, the defendant moved for a nonsuit or dismissal of the complaint, upon the ground that the plaintiff, in his opening, had failed to state a cause of action against the defendant, for the reason that the plaintiff had shown himself guilty of negligence; and, therefore, could not recover; which said motion was denied, and exception taken by the defendant. Testimony was then given on the part of the plaintiff, when the plaintiff rested.

The defendant moved for a nonsuit, on the ground that the plaintiff had failed to make out a cause of action, and that it should appear affirmatively, on the part of the plaintiff, that he was not guilty of negligence, and upon the further ground that it appeared from the plaintiff's own showing that he was guilty of negligence, and hence was not entitled to recover. The motion was denied.

The defendant asked the court to charge the jury that if they found that the defendant was doing the work for the state, as agent or contractor, he was not liable and the plaintiff could not recover. The court declined so to charge and the defendant excepted. The cause being submitted to the jury, they found a verdict in favor of the plaintiff for $151.50, and upon said verdict a judgment was rendered herein on the 5th day of April, 1866, in Wayne county clerk's office, in favor of the plaintiff, for $208.41, damages and costs; from which judgment the defendant appealed to this court.

*Lyon & Norton*, for the appellant.

*C. D. Lawton*, for the respondent.

*By the Court,* E. DARWIN SMITH, J. It is objected by the respondent, preliminarily, that it does not appear from the printed case that a motion for a new trial on the exceptions had been made in the county court, and that the appeal should therefore be dismissed. This objection is based upon the decision in the case of *Simmons* v. *Sherman,* (30 *How. Pr.* 4,) which coincides with a decision to the same effect in *Carter* v. *Werner,* (27 *How. Pr.* 385,) in which it is held that no appeal to this court upon a case or exceptions made on a trial in the county court upon appeal from a justice's court should be entertained until the county court has passed upon the questions presented by such case or exceptions, upon a motion for a new trial made thereon in that court. In conflict with these cases—both general term decisions—the former in the third and the latter in the fifth district, the court in the sixth district, in *Monroe* v. *Monroe,* (27 *How. Pr.* 208,) in *Whitney* v. *Wells,* (28 *id.* 150,) and in *Boughton v. Mitchell,* (29 *id.* 68,) have held that this court, upon appeal from a judgment of the county court, can review the errors brought up by the record, including those contained in a case or exceptions. The same question was passed upon in this court in the case of *Dixon* v. *Buck,* (42 *Barb.* 72,) in which my brethren held, in accordance with the cases in the sixth district. We must therefore adhere, of course, to our own decision on the point; but if the question were a new and an open one, I should greatly prefer to follow the rule or construction of the statute adopted in the cases of *Simmons* v. *Sherman,* and *Carter* v. *Werner,* among others, for these two reasons : 1st, because such rule would probably, in a great variety of cases, obviate the necessity of reviewing the case at all in this court. 2d, because it is most fair and expedient to allow the county judge who has tried the cause the same opportunity to correct the errors he may have made in the haste and pressure of a trial that is possessed by the judges of this court. I have no doubt that the county judges would in a large proportion of the cases thus presented to them review their own decisions

Bliss *v.* Schaub.

with care and circumspéction, and correct their errors with readiness and sound judgment. In this court it is found in practice that the judges constantly review with freedom and fairness, and are pleased to correct, their own decisions at the circuit, and I have no doubt it would be so in a large degree with the county judges ; and I should, therefore, greatly prefer that the rule governing the decisions of the county judges on the trial of causes in that court be restricted to a review of the deliberate decisions of the county court after argument and time given for deliberation and discussion.

Upon the merits of the case I think no error occurred on the trial, or none of any consequence. The case was fairly submitted to the jury, upon the question of the plaintiff's and defendant's negligence, and this court cannot upon any sound principle, in view of the present state of opinion in the Court of Appeals upon this class of questions, interfere with the verdict of the jury, upon this question. The defendant was liable for the negligence of digging the hole in the street and leaving the same open and unprotected or unguarded, within the cases of *Blake* v. *Ferris*, (5 *N. Y. Rep.* 48,) *Pack* v. *The Mayor*, &c. (8 *id.* 222,) *Kelly* v. *The Mayor*, &c. (11 *id.* 432,) and *The City of Buffalo* v. *Holloway*, (7 *id.* 493,) and the plaintiff having hired the wagon injured, and being in the possession of and using it, was entitled, as a bailee thereof, to recover damages for the injury thereto. (*Edw. on Bailments*, 142. *Story on Bailments*, 93. *Faulkner* v. *Brown*, 13 *Wend.* 63.)

The question put to the witness Gordon, whether he had watered horses and seen others water horses at the place in question, was not improper. It was directed to the question of his negligence, which was a question to be affected by the practice and custom of watering horses at that place. The question how much less the horse was worth by reason of the injury, was not improper. It was a question of opinion in respect to the value of the horse before and after the injury,

Auburn Exchange Bank *v.* Fitch.

and was one of that class of questions constantly asked and allowed, on the subject of damages. The same reasons apply to the question, how much the harness was injured.

I think the judgment should be affirmed.

Judgment affirmed.

[MONROE GENERAL TERM, March 4, 1867. *Welles, E. D. Smith* and *Johnson,* Justices.]

--------◆--------

## THE AUBURN EXCHANGE BANK *vs.* MORELL S. FITCH and others.

A man confessedly in embarrassed circumstances, and, as the result shows, insolvent, seeing that a firm of which he is a member must probably fail, may lawfully appropriate his private property to the payment primarily of his private debts, in preference to the partnership debts, by conveying and transferring such property to his private creditors, in payment of their just demands; and such conveyances and transfers will be valid; where there is nothing to impeach the good faith of the grantees, or tending to show that they were privy to any concealment or fraudulent intent or purpose on the part of the grantor, in disposing of his property.

An individual may, at all times, convey or turn out his property in payment of his just debts; and this is none the less true because he is straightened in his circumstances, and unable to pay all his creditors. At such times he may honestly prefer one creditor to another; and if he sells and conveys his property for a fair price, in payment of just debts, the legality of the conveyances or transfers cannot be questioned. Fraud cannot be predicated upon such a transaction, on the assumption that the debtor meant to defraud his creditors.

An intent on the part of the grantees to defraud, or to concur in, or aid in carrying out or consummating any fraud on the part of the grantor, cannot be imputed or inferred from the fact that such grantees did in fact receive transfers of all the property of the grantor, and must have known that his other creditors could not be paid.

The law is not so unjust as to forbid a son from paying an honest debt to his mother, by a conveyance to her of his family residence; nor is it so unreasonable as to require her to turn her son into the street, at the peril of losing the estate. *Per* E. D. SMITH, J.

THE action was brought to set aside several deeds of conveyance of real estate, by the defendants, Morrell S. Fitch, and Laura his wife, to the defendant Mrs. Masters; a chattel mortgage by the said Morrell S. Fitch, to the said Elorsey S. Masters; a transfer of stock in the Auburn Gas Company, by the said Morrell S. Fitch to his wife, and a subsequent transfer thereof by her to the defendant James C. Reed; and transfers to either of the other defendants; and a general assignment by Curtis Hemingway, a defendant, and the said Morrell S. Fitch, to Elmore P. Ross, for the benefit of creditors, on the ground that said conveyances, &c. were made to defraud creditors; and for other relief. The plaintiff was a judgment creditor of Hemingway & Fitch. On and previous to the 8th day of April, 1864, Fitch & Hemingway were partners, and on that day they were insolvent, both jointly and severally. On that day Fitch conveyed all his real estate to his mother, Elorsey S. Masters, and on the same day he executed a chattel mortgage to her upon all his tangible personal property. These deeds were not recorded, nor was the chattel mortgage filed until September 19, 1864. Fitch also at or about the same time transferred his stock and other evidences of debt, mostly to his mother, but a part to his wife, who soon after sold to James C. Reed; having thus disposed of the title to all his property, both real and personal, but still continuing in possession. Fitch united with Hemingway, on the 17th of September, 1864, in making an assignment of all their property *both joint and several* to Elmore P. Ross, who accepted the trust and took possession of all the property included in the schedule annexed to the assignment. This assignment was in fact not only made with the knowledge of the plaintiff, but its provisions were dictated by its president. After the assignment was made, and before this action was commenced, the assignee commenced an action to set aside these same conveyances and transfers. Why the action by the assignee was not prosecuted does not appear.

The making of the assignment is set out in the complaint in the present action, wherein it is alleged as follows : "And the said plaintiff further says, that although more than two months have elapsed since the execution and delivery of said assignment, no property, nor evidence of property whatever of the individual property of said assignors, has passed to the possession or control of said assignee, named in said general assignment. Nor, with the exception of a safe, and some office furniture of trifling value, has said assignee received into his possession, or under his control, any property, or evidence of property from the assets of said firm. And the said plaintiff further says, upon information and belief, that said instrument of assignment was prepared by the said Pingree, and executed and delivered by the said Hemingway & Fitch, not with the honest purpose of distribution through said assignee, of the proceeds of their joint and individual property in the payment of their debts, according to the priorities established in said assignment, but as the closing act of a contrived conspiracy on the part of said Hemingway, Fitch and Pingree, of which the acts and circumstances hereinbefore stated, are parts, to defraud the creditors of said assignors, and to hinder and delay them in the collection of their just debts." The prayer in relation to the assignment is as follows : That " the said instrument of assignment or deed of trust so executed by the defendants, Curtis Hemingway and Morell S. Fitch, to the defendant Elmore P. Ross, may be declared to be fraudulent and void as against the plaintiff in this action, and may be set aside and vacated as such," &c.

Proofs were taken, but no proofs tending to show that Fitch & Hemingway or either of them had any property of which the assignee could have taken possession, or in any wise obtained, except through the action of this court. The defendant Ross, (the assignee,) answered, claiming all the property (if any) which had been fraudulently disposed of by his assignor Fitch.

Auburn Exchange Bank *v.* Fitch.

The cause was tried before Justice James C. Smith, at special term. He found that the conveyances of the real estate, and the transfer of his personal property by Fitch, were made to hinder, delay and defraud his creditors. The court then declares as matter of law "that said assignment * * * is valid, and said Ross as assignee, is entitled by virtue of its provisions, to all the property of said Hemingway & Fitch, or either of them, (including that covered by said transfers and conveyances,) herein declared void (excepting the stock purchased by said Reed of Mrs. Fitch) and including also the avails of said stocks received by Mrs. Fitch for the purpose of the trust expressed in said assignment; and a judgment may be entered, directing said Curtis Hemingway, Morell S. Fitch, Elorsey S. Masters, Laura Fitch and John T. Pingree, and each of them to deliver to said Ross as such assignee, all property in their hands, respectively covered by said transfers, or either of them, and the proceeds and avails thereof in their hands, and perpetually restraining them, their attorneys and agents, from making any other disposition thereof." Appeals were taken by the following parties: (1.) By Morell S. Fitch and Laura Fitch his wife; (2.) By Elorsey S. Masters and John T. Pingree; (3.) By the plaintiff the Auburn Exchange Bank.

*D. Pratt,* for the plaintiff.

*T. R. Strong, Geo. Rathbun* and *D. Wright,* for the defendants.

*By the Court,* E. Darwin Smith, J. The judgment rendered at special term, adjudging that the several conveyances and transfers therein mentioned from the defendant Morell S. Fitch to the defendants Elorsey S. Masters, Laura Fitch and John P. Pingree, including the chattel mortgage also therein mentioned, were fraudulent and void, and directing that the same be set aside, vacated and annulled, was based

upon an express finding of fact in which the learned judge finds "that the said several conveyances and transfers were executed by the said Fitch with intent to hinder, delay and defraud the creditors of the firm of Hemingway & Fitch, (of which the said Fitch was a member,) in the collection of their debts, and were accepted by the said Elorsey S. Masters, Laura Fitch and John P. Pingree, with the like intent."

The legal conclusion drawn by the learned judge from the facts he found was clearly correct, and we are therefore called upon to examine the evidence in the case and see if the said findings upon the facts, as contained in the decision at special term, were authorized or warranted by such evidence.

The several conveyances and transfers thus set aside by the judgment, at special term, were all professedly made in consideration and satisfaction of debts claimed to be justly due and owing to the said respective grantees or vendees of the property, from the said Morell S. Fitch.

In the decision at special term nothing is said about these debts, but in the opinion of the learned judge he says that he had not thought it necessary to decide whether the claim of Mrs. Masters was an honest and valid debt for its full amount, at the time of the transfer. He thought it probable that she had a valid debt originally, but that there was much evidence tending to show that a large portion of it had been paid.

If the learned judge had considered the evidence relating to the validity and justness of these several debts in payment of which the property in question was conveyed or transferred to the several grantees or vendees thereof, and had found, as a matter of fact, that such debts in whole or in part, or any or either of them, were fictitious or trumped up for the occasion, his finding that the said transfers to pay such debts were fraudulent would have been well founded and most incontestible.

But in the absence of any such finding, and upon the concession or assumption that said debts are valid and justly

due and owing to the several parties as claimed and asserted by them, very different rules and principles apply in the review of the question of fraud asserted in such decision. Upon the facts, as they appear in evidence, it seems to me that the debts to Mrs. Masters, to Mrs. Fitch and to Pingree, and to each and every one of them, are clearly established to be honest, just and valid for the full amount thereof, respectively claimed by them. The proof is clear and explicit on this subject, and I do not think it could be found or held otherwise with any degree of fairness.

The existence and validity of the debt of Mrs. Masters is fully proved by herself, by her husband and by Fitch, and there is no evidence in the case to impeach their testimony on this subject, or their credit as witnesses. The debt of Mrs. Fitch is also conclusively proved to have been hers, and to have arisen from her separate property; and the debt of Pingree for professional services and expenses clearly exceeded the securities received by him from Fitch.

Assuming that the said deeds and transfers to Mrs. Masters, Mrs. Fitch and to Pingree were thus given for honest and valid debts, they may nevertheless be held fraudulent and void, and the question of fraud is one of fact; but as, in this view, they are deeds to purchasers for a valuable consideration, the statute declares that they shall not be affected or impaired for any fraud of the grantor or vendor, unless it shall appear that such purchaser had previous notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantee. (2 *R. S. p.* 137, § 5, *title* 3, *ch.* 8. 21 *N. Y. Rep.* 168. 17 *id.* 28.)

We see, then, that the import of the finding at special term is that these deeds and transfers were made to hinder and defraud creditors, and that the grantees were privy to such fraud. In this view of the force and effect of the findings upon the facts at special term, that these deeds and transfers were made and executed with intent to hinder, delay and defraud the creditors of the firm of Hemingway &

Fitch, I think it cannot be sustained, and is not warranted by the evidence.

Morell S. Fitch, at the time of making these conveyances and transfers, was confessedly in embarrassed circumstances, and, as the result shows, clearly insolvent. He owned and had in his possession a large amount of property. The firm of Hemingway & Fitch was greatly extended, and in desperate circumstances, and it was through the losses and embarrassments of this firm that Fitch was straightened, and not from any difficulty in his private affairs. Seeing that the firm of Hemingway & Fitch must probably fail, Fitch, early in the spring of 1862, evidently began to prepare for that event, and determined, it seems, to appropriate his private property to the payment, primarily, of his private debts in preference to the partnership debts. With this view and intent, he made the conveyances and transfers in question, conveying his property to his private creditors in payment of these honest debts. He made and delivered the deeds and transfers on the 8th of April, 1862, and apparently remained in possession of the real estate and household furniture for several months afterwards. It appears that the firm of Hemingway & Fitch floundered along during these several months, when they finally failed, and that during this period Fitch had more or less the hope and expectation that the firm would recover from its embarrassments and sustain itself and go on, and spoke of it and of his own affairs, on some occasions, as though he was the owner of all his private property. So far as Fitch is himself concerned, these facts present about all there is in the case tending to show that he had any fraudulent purpose in disposing of the property. But so far as relates to the grantees in these several conveyances and transfers, there is nothing to impeach their good faith; really nothing, fairly considered, tending to show that they were privy to any concealment or fraudulent intent or purpose on the part of Fitch in disposing of his property.

The deeds to Mrs. Masters were executed and delivered on

the 8th of April, and she testified that she then put them in her safe, and that they remained there till about the first or second of September afterwards, without any design or concert for that purpose, but by mere heedlessness and accident. She let her son remain in her house because he was her son, and had nowhere else to live. She had a perfect right so to do. The law is not so unjust as to forbid a son from paying an honest debt to his mother by a conveyance to her of his family residence; nor is it so unreasonable as to require her to turn him into the street, at the peril of losing the estate. In respect to the gas and telegraph stock transferred to Mrs. Fitch, it appears that the gas stock was purchased with her money, and that she always had the scrip, although it was issued, when first purchased, in the name of Fitch, that he might be a director in the company. Mrs. Fitch had the possession of this scrip before its transfer to her on the books, on the 8th of April, and the new scrip issued in her name was immediately delivered to her, and the telegraph stock was transferred at the same time, and the scrip issued to her. The property transferred to Pingree was choses in action, and was immediately delivered to him, and kept by him as his own. Possession of all the property transferred by Fitch was immediately delivered, and a continued change of possession thereof followed, except in respect to the real estate conveyed to Mrs. Masters, and the property conveyed by the chattel mortgage. The personal property embraced in the chattel mortgage stands upon a somewhat different footing from the other property. Possession not having been taken under it immediately by the mortgagee and continued, the law presumes it fraudulent; and it may be that the creditors might hold this property. The legal presumption against its validity is some evidence on that point, and if it stood alone, and was unconnected with the other property, the finding of fact distinctly declaring it fraudulent, perhaps, could not be disturbed.

Aside from these facts relating to possession of the property,

there is, it seems to me, really no evidence in the case tending to prove that Mrs. Masters, Mrs. Fitch and Pingree, received the conveyances and transfers by them respectively, with any intent to defraud, or with any knowledge or notice that the said Morell S. Fitch had executed said conveyances and transfers with intent to defraud his creditors.

They all deny such knowledge or intent. Mrs. Masters, Mrs. Fitch and Pingree, respectively expressly deny that they had any notice or knowledge of any intent on the part of Fitch to defraud his creditors, and he denies also that he had any such intent. Mrs. Masters testifies that " she did not know or think that Morell was going to make an assignment, or was unable to pay his debts." Masters, the husband of the defendant Mrs Masters, who took the deeds and transacted the business for his wife, with Fitch, testifies that when he was making the deeds he did not know but that he (Fitch) could pay every debt he owed, and more too. He had no suspicions that any thing was wrong. He says, " I handed the deeds to my wife, and she put them in her safe. My wife spoke to me once or twice about having them recorded, but it was neglected by carelessness." So far as particular intent on the part of the grantees in these deeds and transfers to defraud, or to concur in, or aid in carrying out or consummating any fraud on the part of Fitch in making these conveyances, is concerned, I think it is completely and entirely disproved, except so far as such intent may be imputed or inferred from the fact that these several grantees did in fact receive transfers of all the private property of Fitch, and must have known that his other creditors could not be paid. They must all have known, his mother, perhaps, least of all, that he was straightened and embarrassed in his circumstances, and feared that he would be unable to extricate his affairs, and go on with his business. His offer to convey and transfer his property in payment of his private debts implied this, and was of itself notice of his embarrassments. A man does not ordina-

rily propose to transfer all his property to his creditors without some apparent occasion or necessity.

But nothing is clearer than that a man may at all times convey or turn out his property in payment of his just debts ; and this is none the less true, because he is straightened in his circumstances, and unable to pay all his creditors. At such times he may honestly prefer one creditor to another, and if he sells and conveys his property for a fair price in payment of just debts, no one can question the legality of the conveyance or transfer. There is, there can be, no fraud in such a transaction. Fraud cannot be predicated upon it, on the assumption that the debtor meant to defraud his creditors. There is no fraud in the case, if the property in fact goes to pay and satisfy an honest debt. A creditor in such case will ordinarily be anxious to get his pay when his debtor's circumstances are most desperate, and his anxiety and efforts for that purpose will naturally be in proportion to the desperateness of the affairs of his debtors and the danger there is of the entire loss of his debt.

I know it is said in some of the cases, and is said in the opinion of the learned judge at special term, that a transfer may be fraudulent though made to pay an honest debt, and *Twyne's case,* (3 *Coke R.* 80,) *Waterbury* v. *Sturtevant,* (18 *Wend.* 353,) and *Hanford* v. *Artcher,* (4 *Hill,* 271,) are cited in support of this doctrine.

In *Twyne's case,* Twyne took a conveyance of all his debtor's goods, without exception, and left them in possession of the vendor, who continued to use, sell and manage them as his own. It was a case of personal property clearly sought to be covered up by a sham sale. The case of *Hanford* v. *Artcher,* was also a case of personal property, and the question arose under our statute in regard to the sale of personal property, the vendor remaining in possession. The case of *Waterbury* v. *Sturtevant,* was the case of a sale of land in payment of a debt, and the court for the correction of errors

reversed the chancellor's decree, and held the payment good and the deed valid.

The proposition, nevertheless, is in a certain sense true that a man having an honest debt may so use it to aid his debtor in a dishonest scheme of covering up and concealing his property as to render a conveyance to him in apparent payment of such debt fraudulent. But it must be when it is used as a mere cover or instrument of deception, and with intent to keep much more property than the creditors get by the conveyance, or much more in value than his debt from the other creditors. But I deny the proposition that a conveyance by a debtor to his creditor in payment of an honest debt at a fair price, can be impeached for fraud, because some other creditor will lose his debt. It is a perfect absurdity to say that a conveyance of property which pays one's creditor, and nothing more, and pays him a just debt, can be fraudulent as against other creditors of the common debtor.

If a man purchase property of a debtor to aid him to get it into money or choses in action, thereby more easily to hinder and delay or defraud creditors, or take a mortgage on a large amount of property, with the view and design to cover it up so as to hinder the creditors of the mortgagor, such conveyance may doubtless be avoided for fraud.

This is the precise case stated by Senator Edwards, in *Waterbury* v. *Sturtevant*, (*supra*, 364.) In stating the rules in such cases, he said, " I admit that if the property is sold for the purpose of preventing or delaying the collection of a debt, and the purchaser, knowing the facts, makes the purchase for the purpose of aiding that intent, the sale is fraudulent, although a fair consideration is paid." This is not the case of a conveyance made and received in payment of an honest debt. In the race of creditors to get payment of their respective debts from their common debtor, who cannot pay all, each creditor will and may look out primarily for himself, and if he gets or takes no more than a fair and reasonable amount of his debtor's property, and takes and receives it in payment

and satisfaction of his debt, his title thereto cannot be impeached. He is not obliged to look out for other creditors, or to consider whether they will or will not get their debts. There can be no fraud in his getting his own debt, if he takes no more than the pound of flesh, whatever may happen to other creditors of the common debtor.

In this case, I think it clearly appears that the property conveyed by Fitch to Mrs. Masters, Mrs. Fitch and Pingree, was transferred in payment of honest debts, and at nothing more than a fair price, and I do not see how those transfers can be impeached. At least, I think the judgment setting them aside erroneous, and that the same should be reversed.

As this view of the case necessarily involves a new trial, I do not think it necessary or expedient to discuss any other questions in the case.

The judgment should be reversed, and a new trial should therefore be granted, with costs to abide the event.

[MONROE GENERAL TERM, March 4, 1867. *Welles, E. D. Smith* and *Johnson,* Justices.]

———————◆———————

THE HICKSVILLE AND COLD SPRING BRANCH RAILROAD COMPANY *vs.* THE LONG ISLAND RAILROAD COMPANY.

THE LONG ISLAND RAILROAD COMPANY *vs.* THE HICKSVILLE AND COLD SPRING BRANCH RAILROAD COMPANY.

A counter-claim, or defense of an equitable nature, may be interposed although the claim or demand mentioned in the complaint is purely of a common law nature, or for the recovery of money only.

If the claim and counter-claim arose out of the same transaction or contract, there is no necessity for a cross action by the defendant.

The plaintiff sued to recover six months rent of its branch railroad, under a written lease thereof to the defendant, and the defendant set up as a counter-claim, an extinguishment of the right to recover rent, arising from a tender of the purchase price of the branch road, under an option or privilege contained in the lease, before the rent accrued, &c. The lease was of the

Hicksville and Cold Spring Branch R. R. Co. *v.* Long Island R. R. Co.

branch railroad, the land upon which the same was built, embracing the titles, &c. and generally the property "*as it now exists*," (at the date of the lease,) the cost of which was $45,304. The right to purchase was of the *demised premises*, upon payment of the said cost thereof, and all rent computed to the time of purchase; and upon payment, the said *demised premises* were to be conveyed, free from incumbrance. When the tender was made, the defendant required the plaintiff to convey to the former company a *perfect title*, or to convey *with covenant of warranty* as to the title.

*Held* that the defendant, when making such tender, required more than its contract permitted; and the tender was therefore no bar to the claim for rent, and did not prevent its accruing in future.

*Held, also,* that the plaintiff not having demanded, but on the contrary, having resisted, a specific performance in the manner claimed by the defendant; and the defendant having sought to compel the plaintiff to complete its title, at an additional expense, by the tender of the cost, only, of the demised premises, as they existed at the date of the lease, neither party was in a condition to demand a specific performance, in respect to a conveyance of the premises.

*Held further,* that the facts did not warrant a decree compelling the defendant to pay $45,304, as upon an option or privilege of which it had never sought to avail itself.

A claim made for relief, or for a deed, upon terms to which a party is not entitled, does not subject him compulsorily to accept a deed upon some other terms.

In such a case the relief demanded should be denied, simply with or without costs, according to the regulated discretion in equity cases.

APPEAL by the Long Island Railroad Company from judgments entered in the above actions, at special term. The actions were tried together. By an agreement, dated the 22d of November, 1853, the Hicksville and Cold Spring Branch Railroad Company agreed with the Long Island Railroad Company "to cause its road to be built" from Hicksville to the neighborhood of Philetus Ketcham's, at Syosset; and that "after being finished" to that point, the branch road should be operated and used solely by the Long Island Railroad Company, the latter paying to the Branch Company for such use at the rate of seven per cent per annum on the cost, and the taxes. This agreement contained further provisions for extending the branch from Syosset to Cold Spring, and operating the same when thus extended, and

giving the Long Island Railroad Company the right to purchase the branch road at cost, at any time. Prior to March, 1863, the branch was completed to Syosset, and operated by the Long Island Railroad Company. The cost of the road to that point was stated to be $45,304, and the Long Island Railroad Company paid for its use $3171.28 per annum, in semi-annual payments. On the 4th of March, 1863, a lease was executed by the Hicksville and Cold Spring Branch Company to the Long Island Railroad Company, reciting the agreement of November 22d, 1853, the completion of the branch road to Syosset, the cost thereof, and that it was deemed expedient to embrace in a separate lease the road so "completed," and also referring to various acts of the legislature extending the time for building the road to Cold Spring. By this lease, the Hicksville and Cold Spring Branch Railroad Company demise " *All their railroad* with the iron laid upon the same, as so built from Hicksville to the neighborhood of Philetus Ketcham's, (now called Syosset,) *and the land upon which the same is built,* embracing the titles and rights of way granted by various different persons, and including the piece of land at Syosset, which was conveyed to the parties of the first part by John H. Jones, and generally the property as it now exists, the cost of which to the parties of the first part was included in the before mentioned sum of $45,304, with the appurtenances," for and during the existence of the charter of the Long Island Railroad Company, and any renewals thereof, *unless sooner ended by purchase,* at the yearly rent of $3171.28, payable half yearly on the 15th of January and July, and the annual taxes "upon and for the said *road* and *land* with its appurtenances." The lease contains special covenants in relation to the running of trains, &c. with a covenant for quiet enjoyment, and closes with the following covenant : " And it is hereby covenanted and agreed by the parties of the first part, that the parties of the second part shall have the right to purchase the said demised premises at any time, upon payment of the aforesaid cost thereof, namely,

358    CASES IN THE SUPREME COURT.

Hicksville and Cold Spring Branch R. R. Co. *v.* Long Island R. R. Co.

the sum of $45,304, and all the rent computed up to the time of said purchase, and that upon such payment the party of the second part *shall be entitled to a conveyance of said demised premises, free from incumbrances."*

On the 26th of April, 1863, the Long Island Railroad Company elected to purchase the branch road, and notified the Hicskville company of such election, requesting the president to name a time when the Hicksville company would be ready to make the conveyance. To this, the Hicksville company replied by appointing the 29th of May, 1863, at 12 o'clock for the payment of the purchase money and the delivery of the deed, and stated that the purchase money should be paid to the treasurer of the company at his office. The Long Island Railroad Company gave notice of their acceptance of this appointment. At the time and place appointed, the president of the Long Island Railroad Company attended with counsel, and handed the purchase money, and the rent computed to that date (29th of May) to the treasurer of the Hicksville company. The amount was found correct. The president of the Hicksville company and its counsel were present. They produced a deed, which they proposed to execute and deliver, to some clauses in which the counsel for the Long Island Railroad Company objected. The Long Island Railroad Company also claimed that the title of the Hicksville company to its roadway was defective, in that the road passed over the lands of certain persons *the right of way over which had not been procured by the Hicksville company.* Also that in various of the conveyances to that company, the wives of the grantors had not joined, and they had outstanding dower rights therein ; and as to a portion of the land, the purchase money agreed upon for the right of way had not been paid, and they required that those *defects should be cured,* or that the Hicksville company should give a covenant of *warranty.* The Long Island Railroad Company refused to accept the conveyance offered, assigning as reasons as well the objections to the form of the deed as the objec-

tions to the title, and claiming that a good title should be conveyed. The purchase money was thereupon returned by the treasurer of the Hicksville company to the president of the Long Island Railroad Company, and he deposited it in bank, where it has ever since remained, kept at all times in reserve. An executed deed, similar to the one offered on the 29th of May, was tendered to the president of the Long Island Railroad Company, on the 25th of July, 1863, by the attorney of the Hicksville company, and payment of the $45,304, and of the rent accrued, was demanded. The president requested that the deed, or a copy of it, be left with him for examination, which was declined. The tender was made at three or four o'clock in the afternoon, at Hunter's Point. No previous notice of the tender had been given. The money was not paid. The attorney for the Hicksville company then demanded the rent to July 15th, 1863. It was not paid. The deed so tendered did not obviate the objections existing to the one offered on 29th of May. The title of the Hicksville company to its roadway was in fact imperfect; as to some parcels of land, the right of way had not been procured; as to others, there were outstanding rights of dower.

The Hicksville company brought the first above entitled action for the recovery of the rent falling due on the 15th of January, 1864. The Long Island Railroad Company set up, by way of defense and counter-claim, the covenant to convey, and tender of performance by them, and prayed for a specific performance by the Hicksville company. The Long Island Railroad Company also brought a cross-action for specific performance, being the action secondly above entitled. The court rendered judgment for the rent falling due January 15th, 1864, and also that the Hicksville company do execute and deliver a deed to the Long Island Railroad Company, the form of which is settled by the judge, and that on the delivery of such deed, the Long Island Railroad Company pay $45,304, with rent to the time of payment.

The form of deed settled by the judge restricts the covenant against incumbrances, to incumbrances created by the Hicksville company.

*C. A. Rapello* and *A. J. Vanderpoel*, for the appellant.

*C. A. Hand*, for the respondent.

*By the Court*, LEONARD, J. The Hicksville Company sue to recover six months' rent of their branch railroad, under a written lease with the Long Island Company, and the last mentioned company set up, as a counter-claim, an extinguishment of the right to recover rent arising from a tender of the purchase price of the branch road, under an option or privilege contained in the lease, before the rent accrued, and also demand a specific performance of the agreement to convey, and that the Hicksville Co. may be compelled to perfect their title and extinguish all incumbrances.

The action of the Long Island Co. against the Hicksville Company, is to the same effect as the counter-claim above mentioned.

Judgment was rendered, dismissing the complaint in this action, and in the action of the Hicksville Company, the Long Island Company was adjudged to pay the rent claimed, and the plaintiff was adjudged to convey their railroad, free of incumbrances created by themselves, and upon the delivery of the deed the Long Island Railroad Co. were adjudged to pay the purchase price named in the lease, with interest from the 15th of January, 1864, up to which time the Hicksville Company recovered rent in the said action.

The merits of the controversy were tried in the action of the Hicksville Co. There was no necessity for the cross-action by the Long Island Co., inasmuch as the claim and counter-claim arose out of the same transaction or contract, and it is well settled as law, that a counter-claim, or defense of an equitable nature may be interposed, although the claim

or demand mentioned in the complaint is purely of a common law nature, or for the recovery of money only.

This rule appears to be in conformity with the provisions of the Code in respect to equitable defenses.

This is the only question involved by the appeal in the action of the Long Island Co. The Long Island Co. required the Hicksville Co. when the tender was made, to convey to them a perfect title, or to convey with covenant of warranty as to the title. The latter Company were willing to accept the money tendered, but the Long Island Co. insisted upon these terms, and carried their money away.

The lease was of the branch railroad, the land upon which the same is built, embracing the titles, &c. and generally the property *as it now exists* (at the time of the lease,) the cost of which is $45,304, &c.

The right to purchase was of the *demised premises,* upon payment of the said cost thereof, and all rent computed to the time of purchase.; and upon payment, the *said demised premises* were to be conveyed, free from incumbrance.

The Long Island Co. clearly required more than their contract permitted, when they made their tender. The tender was, therefore, no bar to the claim for rent, and did not prevent its accruing in future.

The question of specific performance brings into consideration other facts and circumstances. The relief granted is substantially as if the Hicksville Company were permitted the option, and had made a right tender of a deed to the Long Island Co., and had sued for payment of the consideration. There has been no tender by the Hicksville Co. of such a conveyance as the Long Island Co. were entitled to. They offered a deed which has been found by the judge who tried the case to be not in conformity with the privilege granted. The learned judge has prepared a deed, and adjudged that the Hicksville Co. shall execute and deliver such an one to the Long Island Co. This deed contains a covenant against

their own acts by which incumbrances have been or may be created.

Simultaneously with the delivery of this deed, the Long Island Co. are adjudged to pay the Hicksville Co. the principal sum of $45,304, with interest, &c. The right of the Long Island Co. to receive the deed, is conditioned upon payment. And from the time of such payment, rent and interest are to cease.

I think it is entirely clear that neither party was in a condition to demand a specific performance in respect to a conveyance of the premises. The Hicksville Company did not demand, but on the contrary resisted, a specific performance in the manner claimed by the Long Island Co. The Hicksville Co. could make no such claim, and had no right of action whatever, to recover the price for a conveyance of the premises demised or leased to the Long Island Company.

The Long Island Co. sought to compel the Hicksville Co. to complete their title, at an additional expense, by the tender of the cost only of the demised premises, as they existed at the time of the lease.

The option does not contemplate that the Long Island Co. shall have a conveyance, except upon payment of cost; and the cost, as the road existed when the lease was executed, was agreed upon at $45,304. They had the privilege to acquire so much as the Hicksville Co. then had, at that price. If more should be acquired, the cost would then be more, and the Long Island Co. would have the additional cost to bear. That company made no tender for any additional cost; nor could they, for the amount was not known.

There is no covenant on the part of the Hicksville Co, for the acquisition of additional titles. If there were such a covenant, it would not be within the province of a court of equity to decree its performance, and without such a covenant there is not a shadow of claim to compel the acquisition of other titles.

There has never been any indication of an option by the

Hicksville and Cold Spring Branch R. R. Co. *v.* Long Island R. R. Co.

Long Island Co. to avail themselves of the right to obtain such a deed as the special term has adjudged. Under the tender, such as it was, that company could not have compelled the execution of such a deed as the court have thought proper to award ; literally to crowd upon that company a conveyance which is not regarded as any relief. I can find nothing in the facts which will permit the decree compelling the Long Island Co. to pay $45,304, as upon an option or privilege of which they have never sought to avail themselves. They have never put themselves in condition to be subjected to such terms. A claim made for relief, or for a deed, upon terms to which a party is not entitled, does not subject him compulsorily to accept a deed upon some other terms. In such a case, the relief demanded should be denied, simply, with or without costs, according to regulated discretion in equity cases.

The court below should have rendered judgment for the rent due, with interest and costs of the action, in the action brought by the Hicksville Co. and have denied the relief demanded by the answer, and should have also dismissed the complaint of the Long Island Company with costs.

The present decree has more the appearance of an award by an arbitrator, to whom the parties had referred their matters in dispute, than the judgment of a court regulated by law and precedent.

I think the decree should be modified in conformity with my opinion, as above expressed, without costs in the first case, and with costs against him in the other.

[NEW YORK GENERAL TERM, April 1, 1867. *Leonard, J. C. Smith* and *Ingraham,* Justices.]

### McDOUGALL vs. WALLING.

The right to recover for money lost in betting is a demand arising on contract, and may be set up as a counter-claim, under section 150, subdivision 2, of the Code of Procedure.

The right of action for money lost in betting is assignable.

IN February, 1865, McDougall the plaintiff made a bet with the defendant Walling, that Jefferson Davis' government would have their commissioners in Washington within a fortnight to negotiate a peace. If the southern commissioners should not be in Washington in a fortnight, McDougall the plaintiff should lose the stake of $100, and if such commissioners should be in Washington within that time, the defendant Walling should lose his $100. Each party to this suit deposited $100 in the hands of one Pentland, to await the contingency. After two weeks expired, it was conceded that Jefferson Davis' commissioners were not in Washington, and the plaintiff McDougall directed Mr. Pentland to surrender the $200 to the defendant Walling, and it was supposed that all parties were satisfied, as they then were. But in June, 1865, the plaintiff employed an attorney to commence this suit. The defendant hearing that he was to be sued, purchased of one Clark a claim against the plaintiff amounting to $100 and interest, which arose under the following circumstances: In 1860, the plaintiff made a bet with Clark, that the democratic majority in New York and Brooklyn in November, 1860, would be thirty-five thousand; McDougall (the plaintiff) and said Clark each deposited $100 in the hands of one Fuller, as stakeholder, and after the November election in 1860, Fuller the stakeholder decided that McDougall was entitled to the stakes, and the $200 were paid over by Fuller to McDougall. When the defendant in this suit received an intimation that this suit was to be commenced, he applied to Clark to buy his (Clark's) claim against the plaintiff for the $100 that McDougall had won from Clark. Clark thereupon, before the *commencement*

McDougall *v.* Walling.

*of this suit,* sold to the defendant his claim against the plaintiff for the $100, which the plaintiff had won from him, and when this suit was brought the defendant pleaded it as a counter-claim against the plaintiff's demand, for which this suit is brought. The plaintiff demurred to the defendant's counter-claim ; the demurrer was argued before Justice CLERKE at special term, who overruled the demurrer ; delivering the following opinion :

CLERKE, J. " Since the decision of the Court of Appeals in *Meech* v. *Stoner,* (19 *N. Y. Rep.* 26,) it cannot be doubted that the right of action for money lost in betting is assignable. That action was for money lost in gaming ; but there is no distinction in principle which could make the one not assignable and the other assignable. The only question, therefore, remaining in this case is whether the right to recover for money lost in betting can be set up as a counter-claim under the second subdivision of section 150 of the Code of Procedure. Does it arise on contract ? I think it does. It belongs to that species of implied contracts to pay such sums of money as are charged upon every citizen by the sentence or assessed by the interpretation of the law. In this sense a man is bound by an implied contract to pay judgments recovered against him. In the same way the law implies a contract to a pay a penalty, to abide by a forfeiture and an amercement. These implied contracts give a right of action, *ex contractu,* against the party against whom these judgments have been recovered or penalties imposed. So, in the present case, the law declares that the plaintiff had no right to receive the amount in question. Having no right to receive it, he is bound to return it to the owner, the person from whom he won it. In other words, the law imputes an implied contract that this money should be restored by the person who unlawfully obtained it.

Demurrer overruled, with costs ; with leave to plaintiff to reply within twenty days on payment of costs of demurrer."

From this decision the plaintiff appealed to the general term.

*S. H. Harris,* for the appellant. I. The Revised Statutes declare all bets upon unknown or contingent events unlawful, and all contracts for, or on account of any money or property, or thing in action, so wagered, bet or staked, shall be void. (1 *R. S.* 662, § 8.) The bet constituting the defendant's counter-claim was therefore illegal, and the agreement to pay to the winner of the bet the money, as averred in the counter-claim was void. The bet related to a public election, and was void at common law, as against public policy, before the statute was passed. (*Lansing* v. *Lansing,* 8 *John.* 454. *Vischer* v. *Yates,* 11 *id.* 23. *Rust* v. *Gott,* 9 *Cowen,* 169. *Brush* v. *Keeler,* 5 *Wend.* 250.)

II. 1 Revised Statutes, 662, section 9, gives the loser the right to sue the winner for the money paid him upon the event of the bet. Without this provision, no action could be maintained by the loser after the money was paid to the winner. The reason was that both parties had participated in an illegal act, and were equally guilty, and the law left them as guilty parties without relief. The winner being in possession, his condition was the best, and he was permitted to retain the money won. The design of the 9th section, giving the loser this right of action, was to compel the winner to restore his ill gotten gains. The theory of the statute is, that the winner unlawfully retains whatever has been paid to him; and that its retention by the winner may not be an encouragement to vice, the loser has this statute right to sue.

III. The defendants' counter-claim is not available as a defense. It does not arise on contract. The word contract, in section 150 of the Code, subdivision 2, does not embrace a simple statute right to sue for moneys lost in an illegal transaction. It means contracts in the usual sense of that term— a debt or damages arising out of contract. The cases of *R. F. H.* v. *S. H.* (40 *Barb.* 9; *The Mayor* v. *The Parker*

McDougall *v.* Walling.

·*Vein Co.,* (12 *Abb.* 300 ;) *The Zenia Bank* v. *Lee,·* (7 *id.* 389, 390,) hold that the word contract in subdivision 2 of section 150 of the Code does not refer to duties raised by law, where in truth no contract exists. The obligation of an innkeeper to respond in damages for the goods of his guest that may be stolen, is a duty raised by law ; but it cannot be said to arise on contract. On the contrary, it is always classed among demands *ex delicto ;* so an action for a false warranty.

All acts or omissions which the law recognizes as the subjects of its provision or application in civil actions, are either contracts or torts ; contracts are agreements express or implied ; torts are injuries or omissions done to individuals. Injuries may be by nonfeasance, not doing that which it was a legal duty to perform. In this case, if the statute raises an obligation that the winner repay the money, his failure to do so is a nonfeasance, in regard to an obligation the law imposes upon him. The winner wrongfully retains the money won. This is an injury, and comes under the classification of torts. (1 *Hilliard on Torts,* 2. *Chitty's Gen. Prac.* 8. *Betts* v. *Hillman,* 15 *Abb.* 184. *Bevins* v. *Reed,* 2 *Sand.* 486. *S. C.* 40 *Barb.* 9, 10.) If it were conceded that the statute giving a right of action for money lost upon a bet raises a duty that the winner repay the same, it would not by any means follow that this duty is a contract within the meaning of section 150 of the Code. The learned justice at special term cited a judgment, as an illustration. A judgment is a debt of record, but a mere right to sue is not of itself a debt, nor is it a demand. It is simply what the statute says it is, " The right to sue." · (*Jacobs' Law Dict. " Debt."* 3 *Black. Com.* 154. 1 *R. S.* 622, §§ 8 *and* 9. *Denny* v. *Man. Co.,* 2 *Hill,* 220.) Debt imports a sum due upon contract, express or implied. (2 *Hill,* 220.) This right to sue may be assigned. So may a right of action for the conversion of personal property ; both rights of action, however, arise from a wrongful act committed. In one case it is a conversion of personal property. In the other the conversion of the money

belonging to another. But it is an error to say that the statute raises any duty of the nature of a contract that the winner repay the money. When a judgment is recovered against him, that judgment may raise a contract obligation to pay it, but the loser's simple right to sue does not. The winner unconscientiously retains the money won. He illegally came into the possession of it. The statute gives the loser the right of action for what is illegally retained by the winner. (*See Bevins* v. *Reed,* 2 *Sandf.* 436.) The law may imply a contract to pay a penalty or abide by a forfeiture, because the one or the other may be imposed as a condition of receiving or accepting the benefit of transactions which are illegal. This is not such a case. The loser's right to sue is not for a penalty or forfeiture. The counter-claim is not based upon any implied contract of the winner to pay. It is the right to sue under the statute that is the subject of the counter-claim. Whatever may be the nature of the obligation of the winner to pay, it is very certain that the *loser's claim* is simply a *right to sue.*

IV. There being no right of action except by statute, and the statute giving the loser only the right to sue, is not available as a defense. The case of *Bevins* v. *Reed,* (*supra,*) decides expressly that such a claim as is here set up as a counter-claim cannot be thus used, but can only be enforced *by an action against the winner.*

V. Assumpsit does not lie to recover of the winner the money lost. (*Bevins* v. *Reed,* 2 *Sandf.* 436. *McKeon* v. *Caherty,* 1 *Hall,* 300.) The transaction being unlawful, the winner is a tort-feasor, and the claim against him partakes of the nature of a tort. (*Betts* v. *Hillman,* 15 *Abb.* 184, 187.) This case holds that the illegal transaction partakes of the nature of a tort.

The case of *Meech* v. *Stoner,* (19 *N. Y. Rep.* 26,) holds that the retention of the money by the winner is a wrong done to the estate of the loser, and that the recovery by the loser is for the wrong. This case virtually places the winner's